## THE STATE v. ED. LINN, Appellant.

**Division Two, November 23, 1909.**

1. **INSTRUCTION: In Words Asked.** The defendant is in no position to complain of an instruction given for the State, if he asked one in the identical words of that given.

2. ————: **Manslaughter: Conviction of Murder.** The court gave this instruction on manslaughter in the fourth degree: "The court instructs the jury, That if defendant brought on the difficulty or entered into it with the intention of killing, or inflicting great personal injury upon, said O. H. Nettles, then the danger, if any, in which he found himself during such difficulty would not extenuate his offense or reduce its grade at all; but if he voluntarily brought it on or entered into it without any intent of killing or inflicting great personal injury upon said O. H. Nettles, and during such difficulty it became necessary for him to kill said O. H. Nettles, to save himself from being killed or receiving great personal injury, then he cannot be entirely excused on the ground of self-defense, but in that case you should find him guilty of manslaughter in the fourth degree." Defendant asked an instruction in the same words. *Held*, the court did not err in failing to define manslaughter more fully than it did, especially as the jury found defendant guilty of murder in the second degree.

State v. Linn.

3. ———: **Refusing Defendant's.** It is not reversible error to refuse defendant's instructions on the subject of self-defense, even though they be correct announcements of the law, if that given on the part of the State fully covers all the rights of defendant and states the law of the subject as fully and favorably as he could ask.

4. **JURORS: Impeachment of Verdict.** Jurors speak through their verdict, and cannot be allowed to violate secrets of the jury room, or tell of partiality or misconduct that transpired there, nor speak of methods which induced or operated to produce the verdict. Nor can any witness testify what he heard one of the jury say of the methods used by the jury to arrive at their verdict, in support of a motion for a new trial asserting misconduct on the part of the jury.

5. ———: ———: **Quotient Verdict.** A witness for defendant testified, in support of his motion for a new trial alleging misconduct on the part of the jury, that, about a half hour after the verdict was returned, assessing defendant's punishment at imprisonment for twenty-four years, he found in front of the judge's desk and jury box a paper which he identified and offered in evidence, containing a column of twelve numbers ranging from 10 to 35, and the twelve numbers had been added and the sum divided by twelve, producing the quotient of twenty-four. No other trial intervened between the return of the verdict and the finding of this paper. There was nothing to indicate that the figures were in the handwriting of any member of the jury, and nothing to indicate that the jurors agreed in advance to adopt as their verdict the quotient resulting from dividing by twelve the aggregate of the numbers set down on the paper. An offer to prove by this witness a statement of one of the jurors was refused. *Held,* the paper was insufficient to establish any prior agreement to be bound by the quotient verdict, or to overthrow the verdict.

Appeal from Oregon Circuit Court.—*Hon. J. L. Fort,* Special Judge.

AFFIRMED.

*Geo. M. Miley* and *E. P. Dorris* for appellant.

(1) The information is vague and uncertain and fails to charge any offense under the statute; it fails to charge that a mortal wound was given the deceased by reason of the alleged assault with the knife in

question, leaving the charge without any connection between the cutting or stabbing with the knife and infliction of the mortal wound, and omits to charge that the mortal wound was given feloniously, deliberately, premeditatedly on purpose and of his malice aforethought; lacking in these respects, the information does not directly charge that O. H. Nettles was given a mortal wound: State v. Brown, 168 Mo. 449; State v. Ferguson, 152 Mo. 92; State v. Birks, 199 Mo. 271; State v. Williams, 184 Mo. 261; State v. Green, 111 Mo. 585; State v. Rector, 126 Mo. 329; State v. Woodring, 191 Mo. 627. (2) The court erred in failing to define what constitutes manslaughter in the fourth degree. The court carefully defined what constitutes murder in the first and second degrees, and then instructed the jury as to murder in the first and second degrees and manslaughter in the fourth degree, but did not undertake to define what constitutes manslaughter in the fourth degree. This was manifest error; when the evidence shows that a defendant may be convicted of either of the different degrees of a crime the jury should be fully informed by the court in what these different degrees consist, otherwise the jury may be misled and assess a punishment against the defendant for an offense of which he is not guilty: State v. Bryant, 55 Mo. 79; State v. Sloan, 47 Mo. 604; State v. Wyatt, 50 Mo. 309; State v. Matthews, 20 Mo. 55; State v. Barnham, 82 Mo. 67; State v. Crabtree, 111 Mo. 136; 12 Cyc., pp. 639, 640. A definition by the court of the crime in precise and accurate language, setting forth the constituent elements thereof, is indispensable: State v. McCaskey, 104 Mo. 644; State v. Reakey, 62 Mo. 40; State v. Branstetter, 65 Mo. 155; 12 Cyc., p. 614. Under the evidence in this case manslaughter in the fourth degree should have been fully defined by the court and submitted to the jury: State v. Ellis, 74 Mo. 207; State v. Holme, 54 Mo. 153; State v. O'Hara, 92 Mo. 59; State v. Umfried, 76 Mo. 407;

State v. Diekman, 75 Mo. 570; State v. Evans, 158 Mo. 606. The court erred in refusing defendant's instructions: State v. Gordon, 191 Mo. 114; State v. Reed, 117 Mo. 604; State v. Haines, 160 Mo. 555; State v. Hill, 69 Mo. 451. (3) The refusal of the court to give instructions asked by defendant minimized the right of self-defense and was very prejudicial to the rights of defendant. The instruction given for State upon the whole are too strongly colored for the State: State v. Mathews, 148 Mo. 185. (4) The jury were guilty of misconduct in arriving at their verdict by setting down or causing to be set down on a piece of paper the term of imprisonment which in the opinion of each juror should be assessed against the defendant and adding these sums together and dividing the total sum by twelve and the quotient accepted as the verdict of the jury, and such conduct justifies a reversal: State v. Branstetter, 65 Mo. 149; Williams v. State, 66 Ark. 264; Railroad v. Com., 3 Ky. L. Rep. 650; Williams v. State (Tenn.), 15 Lea 129; White v. State, 37 Texas Cr. 651; Magill v. Texas (Cr. App. 1902), 67 S. W. 1018; State v. Vincent (S. D. 1902), 91 N. W. 347.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State.

(1) Defendant says that the information fails to directly charge that deceased was given a mortal wound. A perusal of the information, refutes this suggestion. The words omitted in the indictments discussed in the cases cited by defendant, are incorporated in the information here. State v. Birks, 199 Mo. 27; State v. Williams, 184 Mo. 264. (2) The evidence for the State directly and positively showed defendant's guilt. Whatever conflict of evidence there was, the jury settled against the defendant. State v. Smith, 190 Mo. 723; State v. McGee, 188 Mo. 409. (3) This sixth instruction given by the court was offered by defendant and incorporated in the instructions as given in

the identical form in which defendant offered it. Defendant cannot complain that the court gave the identical instruction which he asked. R. S. 1899, sec. 2535; State v. Pohl, 170 Mo. 428; State v. Manicke, 139 Mo. 548; State v. Haney, 168 Mo. 197; State v. Cushenberry, 157 Mo. 182; State v. DeMosse, 98 Mo. 342; State v. Barnett, 110 Mo. App. 590. Instruction numbered 13, approved in the Beckner Case, predicated the consideration of the defense of self-defense upon a failure of the jury to find that defendant "brought on or entered into the difficulty . . . with the intention of taking advantage of Brown or killing him, or of doing him some great bodily harm." State v. Beckner, 194 Mo. 299. In State v. Barrington, referring, however, to an instruction upon a different phase of the case, this court approved the series of instructions in the Thomas Case, 78 Mo. 338; State v. Barrington, 198 Mo. 101. The instruction given as to self-defense, was properly drawn and conformed to approved precedents. State v. Gordon, 191 Mo. 132; State v. Grant, 152 Mo. 67; State v. Shoultz, 25 Mo. 152. This instruction fully and favorably covered the law of self-defense. For that reason the court's refusal of defendant's requested instructions was not error. State v. Pennington, 146 Mo. 35; State v. Parker, 172 Mo. 204; State v. Berkley, 109 Mo. 676. (4) There was nothing to indicate whether the jury made the computation shown by the paper in evidence; nothing to indicate that they agreed in advance to adopt as their verdict the quotient resulting from dividing by twelve the aggregate of the numbers representing each juror's individual opinion as to proper length of defendant's punishment. The verdict cannot be set aside on this sort of showing. State v. Branstetter, 65 Mo. 152; Sawyer v. Railroad, 37 Mo. 263; Sharp v. Railroad, 114 Mo. 106; McMurdock v. Kimberlin, 23 Mo. App. 526; Jobe's Admr. v. Weaver, 77 Mo. App. 671. The paper produced furnishes no basis for any inference that there was an

agreement that the jury would abide by any quotient obtained by the method alleged to have been pursued. Batterson v. State, 63 Ind. 537. And it is the prior agreement to be bound which vitiates the "quotient verdict." Glidewell v. State, 15 Lea 136; Leveret v. State, 3 Tex. App. 217; Batterson v. State, 63 Ind. 537; Thompson v. Com., 8 Grattan 650; Crabtree v. State, 3 Sneed 303.

GANTT, P. J.—On the 29th day of June, 1908, the prosecuting attorney of Oregon county filed, in the circuit court of said county, an information, charging Ed. Linn and John Rodman with murder in the first degree. An application for change of venue, based on the alleged prejudice of Judge Evans, was filed by Linn, and sustained. The trial was set for September 1, 1908, and Judge Fort was requested to try the cause. The defendant Linn was duly arraigned and pleaded not guilty. The jury was impaneled and sworn and, having heard the evidence, found the defendant guilty of murder in the second degree and fixed his punishment at twenty-four years in the penitentiary. Motions for new trial and in arrest of judgment were filed and overruled and the defendant sentenced in accordance with the verdict.

The evidence for the State tended to show the following state of facts:

On February 26th a wedding was in progress at the farmhouse of Ockley Nettles in Oregon county, Missouri. The house was occupied by a tenant named Morrow and was situated about one hundred yards from the residence of Ockley Nettles, the deceased, on the same farm. About two o'clock in the afternoon of that day on which the killing occurred, the defendant appeared at his father's house, procured a bottle of whisky, inquired for John Rodman, who was subsequently indicted as accessory, and immediately departed in search of him. On that afternoon, defendant

and Rodman appeared at the home of Mrs. Mary Net-
tles in a somewhat intoxicated condition.  Learning
from Mrs. Nettles that a wedding was to occur at Mor-
row's, they left the house and proceeded towards the
latter's place.  Arriving at Morrow's the defendant
and Rodman did not enter the house, but went around
behind it and drank some whisky that they had brought
with them.  Seeing the deceased Nettles, they invited
him to drink with them, and he did so.  Defendant
and Rodman then walked up the road with one Under-
wood and returned cursing and blackguarding, the de-
fendant boasting of their ability to whip any one pres-
ent.  In the meantime, the deceased had returned to
a position near the entrance of the house and was lean-
ing against a post of a shed adjacent thereto.  Defend-
ant and Rodman approached the deceased, and Rod-
man asked him if he had anything against him.  De-
ceased replied that he had not.  Defendant then put
the same question and received a like reply.  Deceased
then asked Rodman if he (Rodman) had anything
against him, and Rodman said he had not.  Deceased
then asked defendant a like question and defendant re-
plied, ''Yes, you ran over my father, and I am not go-
ing to take it,'' and then with an oath said that the de-
ceased could not treat him that way.  Suiting the
action to the word, defendant drew his knife and step-
ped in front of the deceased.  He raised his knife,
whereupon deceased stooped to pick up a stick, and as
he did so, the defendant rushed in on him and dealt
the fatal blow.  At this juncture, the deceased either
struck or struck at the defendant with a stick, but ap-
parently without effect.  He then dropped the stick
and grappled with the defendant, endeavoring to pre-
vent the defendant cutting him further with the knife.
They struggled for a short time until the deceased
cried to a bystander ''to take him off, he has killed
me.''  Rodman then seized the defendant and forced
him from the deceased, who staggered by and behind

the corner of the house. Defendant released himself
from Rodman's grasp, and saying, ''I will kill him,
G—d—him,'' ran after the deceased. As deceased
fell, defendant struck at him again with his knife. Re-
turning from this second assault defendant said he
''had cut him to the heart, G—d—him.'' Defendant
and Rodman then left the premises. The wound in-
flicted by the defendant upon the deceased practically
severed the femoral artery in the left thigh, death re-
sulting in a very short time from the loss of blood.
There was also evidence that sometime prior to the
killing, the defendant, in talking to one Baker concern-
ing a difference between the deceased and the defend-
ant's father, had said ''he was going to get right some
of these days and go down there on him.'' To the
suggestion that the deceased might best him, defend-
ant answered, ''I will knife him.'' To which Baker
replied, defendant would be sent to the penitentiary,
and defendant answered, ''I do not give a d—.'' On
Monday, two days before the killing, defendant, while
sharpening his knife, refused to swap it, saying, ''I
might want to kill a man with it.'' On the part of the
defendant there was testimony to the effect that when
defendant and Rodman returned to the house, just
before the killing, they were talking pretty loud and
ugly, and the deceased asked defendant to be quiet.
Rodman then said to the deceased, ''You can say what
you please to the Linns and Rodmans behind their
backs, but they are the stuff.'' Deceased said: ''You
are not throwing that at me are you? I ain't got noth-
ing against you, I always thought a heap of you boys.''
And defendant retorted; ''Yes, but you run over an
old man and by G— I will take up for him.'' The de-
fendant had clinched the deceased before the latter
struck the former.

The defendant's testimony corroborated that of
the State as to the deceased's efforts to avoid the knife
in the struggle. Some of the defendant's witnesses

did not hear defendant and Rodman question the deceased as to whether he had anything against them. They described defendant's knife as a "deerfoot" knife with a blade about three and a half inches long.

A physician, who examined defendant in the jail sometime after he was in prison, testified that defendant's right wrist was swollen as if he had received a blow upon it, and the jailer testified that soon after receiving the defendant at the jail, he observed a scratch on his neck and one on his right wrist. The flesh was not discolored.

The defendant testified in his own behalf that on the afternoon of February 26th, he went to his father's house to get a note which had been drawn for Rodman to sign, the latter being indebted to him for a small amount. That he procured the note and a bottle of whisky and met Rodman on his way home. Rodman importuned him to go with him to the wedding, suggesting that Rosenbaum and Hornbuckle would be found there; that thereupon they proceeded to Mrs. Mary Nettles', and from there went to the Morrows'. He then detailed the occurrences at Morrow's very much as the State's witnesses had done. His description of the killing was that immediately prior thereto he heard deceased ask Rodman if he had anything against him and Rodman said no, and Rodman then asked a like question and deceased slapped him on the shoulder and said, "I ain't got nothing against old John and never did have." Deceased then asked the defendant the same question, to which, defendant replied, "No, Ockley not a thing. You run over an old man once, but you cannot do me that way. If you do me that way I will whip you fair." Deceased then said, "Don't throw that old thing up to me," and reached for a club, and when he did this, defendant rushed on him. He declared that the deceased struck him on the head and left wrist with a stick; that his knife was in his pocket at this time and during the struggle until

deceased began choking him and attempting to "ride him down, and he seen that there was no show for him," defendant drew his knife, opened it and "struck one lick at his body," but did not know whether he hit him or not; that deceased seized his wrist and endeavored to cut him with the knife which he (defendant) still held; that some one then grabbed defendant and jerked them apart and slung defendant down hill. "And when I came to myself I was standing with the knife in my hand in front of John Rodman." Defendant and Rodman then went to defendant's father's house and thence to the justice of the peace to whom defendant surrendered. Defendant identified the knife which he testified was the one with which he inflicted the fatal wound.

In rebuttal the State introduced evidence tending to show that the knife exhibited by the defendant at the house of the justice of the peace, after his surrender, was not the one identified by him at the trial. That at Johnson's, the justice, defendant displayed his right wrist and it was green all the way round; that there was no other indication of injury to it. Defendant then said: "He had stabbed the deceased first in the groin, and had 'hacked' him across the throat as they drew him loose." Defendant was cool and collected, laughing and joking until about eight o'clock, when he went to sleep behind the stove. One witness testified that he attempted to open defendant's knife with one hand, as Rodman stated defendant had done in the struggle with the deceased, but was unsuccessful. This was substantially all the evidence in the cause.

The court instructed the jury as to murder in the first degree, murder in the second degree, manslaughter in the fourth, and self-defense, to the giving of all of which instructions the defendant excepted. Defendant requested and the court refused certain instructions on the subject of self-defense and manslaughter

in the fourth degree. To which action of the court the defendant saved his exceptions.

I. Defendant assails the information as insufficient to charge any offense, in that it fails to charge that the mortal wound was given the deceased by reason of the alleged assault with the knife. The language of the information in this connection is: "That one Ed Linn on or about the 26th day of February, 1908, at and in the county of Oregon and State of Missouri, in and upon one O. H. Nettles, then and there being feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did make an assault, and with a certain knife which he, the said Ed. Linn, in his right hand then and there had and held, him the said O. H. Nettles, feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did strike, stab and thrust in and upon the right side of the left thigh of him the said O. H. Nettles, giving to the said O. H. Nettles then and there with the knife aforesaid in and upon the right side of the left thigh of him the said O. H. Nettles one mortal wound of the length of two inches, of the breadth of one inch and of the depth of three inches, of which mortal wound the said O. H. Nettles then and there instantly died." The indictment itself is a sufficient refutation of the charge made against it and contains the words which were omitted in State v. Williams, 184 Mo. 261, and State v. Birks, 199 Mo. 263, and the absence of which required the reversal of the judgment in those cases.

II. It is also assigned as error that the circuit court failed to define manslaughter in the fourth degree. As already said, the court had fully instructed on murder in the first degree and murder in the second degree, and then gave instruction numbered six in these words: "The court instructs the jury, That if the defendant brought on the difficulty, or entered into it with the intention of killing, or inflicting great per-

sonal injury, upon said O. H. Nettles, then the danger, if any, in which he found himself during such difficulty would not extenuate his offense or reduce its grade at all; but if he voluntarily brought it on or entered into it without any intent of killing or inflicting great personal injury upon said O. H. Nettles, and during such difficulty it became necessary for him to kill said O. H. Nettles, to save himself from being killed or receiving great personal injury, then he cannot be entirely excused on the ground of self-defense, but in that case you should find him guilty of manslaughter in the fourth degree.''

And in another instruction the court instructed the jury that if they should convict the defendant of manslaughter in the fourth degree they would assess his punishment at imprisonment in the penitentiary for two years or by imprisonment in the county jail for not less than six months or by a fine of not less than five hundred dollars, or by both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

It appears from the record that the defendant requested this identical instruction of the court and requested no other instruction on the subject of manslaughter in the fourth degree, and saved no exceptions to the failure of the court to instruct more fully on that degree of offense. Under these circumstances, the defendant is in no attitude to complain that the court declared the law on the subject of manslaughter in the identical words requested by the defendant. Moreover this instruction is predicated upon the only state of facts under the evidence in this case which would have reduced the homicide to manslaughter in the fourth degree and the defendant had the full benefit thereof.

We think there was no reversible error because the court failed to define manslaughter any more fully

than it did, especially as the jury did not find the defendant guilty of that grade of offense.

III. On the subject of self-defense the court gave instruction number seven, in these words: ''The court instructs the jury that if you find and believe from the evidence that defendant had good reason to believe from the words, acts and conduct of the deceased, O. H. Nettles, that he had a design to do him (Linn) some great personal injury or bodily harm, and that such design was about to be accomplished, then defendant had a right to act on appearances, and to cut or stab said Nettles to prevent the accomplishment of such design, even though such cut or stab resulted in the death of said Nettles; and in this connection you are further instructed that defendant was not required to nicely gauge the force used, but that he could use any means that appeared reasonably necessary under the circumstances. Neither is it necessary that his danger should have been real or actual, or that it should have been impending and about to fall, but if he had reasonable cause to believe and did believe these facts and cut and stabbed the deceased to prevent such expected harm, then you must acquit him on the ground of self-defense.''

The court refused two instructions on the same subject requested by the defendant, but it is evident that the instruction above set out fully covered all the rights of the defendant and states the law as fully and favorably to defendant as he could ask, and as it has been repeatedly held that when such is the case, it is not error to refuse other instructions, even though they may be correct announcements of the law.

IV. Finally it is insisted that the misconduct of the jurors in the method employed by them in arriving at their verdict, is sufficient to justify a reversal of the judgment. In support of this assignment, the record shows that one of the defendant's witnesses testified upon the hearing of a motion for new trial,

that about a half or three-quarters of an hour after the verdict was returned and the jury discharged, he found in front of the judge's desk and the jury box, a paper which he identified and offered in evidence, containing a column of twelve figures, ranging from 10 to 35, and twelve numbers had been added and the sum divided by twelve producing a quotient of twenty-four, this last number corresponding to the number of years at which the jury assessed the defendant's punishment in the penitentiary. No other trial intervened between the return of the verdict in this case and the finding of this paper by the counsel. There was no other evidence offered on this head. There was nothing to indicate that these figures were in the handwriting of any member of the jury and absolutely nothing to indicate that they agreed in advance to adopt as their verdict the quotient resulting from dividing by twelve the aggregate of the numbers set down on said exhibit. The offer to prove by this witness a statement of one of the jurors was properly refused. This court in State v. Underwood, 57 Mo. 40, laid down the rule that jurors speak through their verdict and cannot be allowed to violate secrets of the jury room and tell of any partiality or misconduct that transpired there, nor speak of methods which induced or operated to produce the verdict, and this has become the settled law of this State. [State v. Branstetter, 65 Mo. 1. c. 156; State v. Coupenhaver, 39 Mo. 430; Sawyer v. Railroad, 37 Mo. 263.

The paper exhibit was utterly insufficient to establish any prior agreement by the jurors to be bound by the quotient verdict. Indeed the paper was not shown to have been an act of any member of the jury and it is clearly insufficient to overthrow the solemn verdict of the jury.

It results that the judgment and sentence of the circuit court must be and is affirmed. *Burgess* and *Fox, JJ.*, concur.