THE STATE v. R. H. STOGSDILL, Appellant.—23 S. W. (2d) 22.

Division Two, December 11, 1929.

106

*J. A. McCollum* and *Spradling & Dalton* for appellant.

*Stratton Shartel,* Attorney-General, and *A. B. Lovan,* Assistant Attorney-General, for respondent; *M. E. Montgomery, James A. Finch* and *R. L. Ward* of counsel.

114

COOLEY, C.—In the Circuit Court of Cape Girardeau County, defendant was convicted of murder in the second degree and sentenced to forty-three years' imprisonment in the penitentiary, from which he appeals. One B. M. Hargett was murdered at Chaffee, in Scott County, on October 17, 1927. Appellant and two others, Coy

Lasley and George Fowler, were jointly indicted for the crime, the indictment charging murder in the first degree, and upon their application were granted a change of venue to the Circuit Court of Cape Girardeau County, where Lasley and Stogsdill filed affidavits disqualifying the regular judge and thereupon Hon. E. M. Dearing, judge of the Twenty-first Judicial Circuit, was called to try the case. A severance was granted, and in this case appellant Stogsdill alone was tried.

In brief outline the evidence on behalf of the State was to the following effect:

Lasley, George Fowler and the appellant lived at Chaffee, and were in the employ of the St. Louis-San Francisco Railroad Company, referred to as the Frisco. Lasley and Fowler were brakemen, having been so employed on the Frisco for a number of years, and were members of the Brotherhood of Railway Trainmen. Stogsdill was a special agent for the railroad company, his duties being to protect railroad property and aid in investigating offenses against same. Hargett, the deceased, was a brakeman who had come to Chaffee from his home in Jonesboro, Arkansas, to seek work with the Frisco, the day before he was killed. He did not belong to the above-mentioned organization, nor did appellant.

A year or so prior to this time the Frisco had taken over and begun to operate a line of railroad known as the Jonesboro, Lake City & Eastern Railroad, referred to as the J. L. C. & E., and thereafter the seniority of employees of both roads was intermingled; that is, an employee of the J. L. C. & E. could come to the Frisco without losing his seniority rights of employment. It seems that an employee longer in the service had the right to displace, "bump," one who was junior to him in the same branch of service. The Frisco maintained in the office at Chaffee a board called the extra board upon which would be written the names and local addresses of men seeking work and when there was work for them they would be called. When Hargett arrived at Chaffee he registered at the office and his name was placed on the extra board. He obtained a room at the Horstman rooming house. It is not shown that he had seniority rights over Lasley or Fowler. It does appear from Fowler's testimony that while they had not previously known Hargett personally, Lasley, Fowler and appellant looked upon his as a "scab" and that they resented his coming to Chaffee; that Stogsdill said if Hargett would scab on railroad men he would scab on him (Stogsdill), and that they decided and agreed on the afternoon of October 17th that they would take him out that night and give him a whipping and run him out of town. Lasley, Fowler and appellant had known each other for some time and were on friendly terms. It further appears that Lasley, Fowler and appellant were together

a good part of the afternoon of the 17th, one Stokely being with them part of the time, and that they consumed a large quantity of whisky. During the afternoon the three alleged conspirators made the arrangement above mentioned to take Hargett out that night.

In the evening shortly before seven o'clock, Fowler inquired of John Crader, call boy at the Frisco office, where Hargett could be found, and was informed that he was in room 4 at Horstman's. Asked by Crader why he wanted to know where to find Hargett, Fowler said Hargett was king of the scalies, from Jonesboro. Appellant and Lasley were at the time sitting in Lasley's Ford touring car in front of the office. Fowler got in with them and the three drove away. They drove to appellant's home, where appellant procured his pistol, which he gave to Lasley. Returning to the business center of the town they presently drove into the parking space in the street in front of Horstman's rooming house, which was upstairs over a business place, and stopped. Appellant remained in the car while Lasley and Fowler went up to Hargett's room, masking their faces with handkerchiefs as they went up the stairs. Hargett had retired. They compelled him to get up, telling him they were going to take him for a ride, and searched him for weapons, finding none. Hargett drew on his shirt, overalls and shoes, but was not given time to button his shirt or lace his shoes. While he was stooping over to lace a shoe, with his foot resting on the edge of the bed, Lasley struck him on the head with the pistol he carried, producing a wound from which blood dropped on the bed sheet, and on the floor and stairs as they descended. They took him to the car and compelled him to get in the back seat where appellant was waiting. Lasley handed the pistol to appellant, he and Fowler got in the front seat, and they drove away, Lasley driving. When they had driven about four blocks three shots were fired in the back part of the car; Hargett cried out: "Oh, Lordy; help, help," and almost immediately fell or was pitched out of the car, which was still moving and did not stop. Fowler testified that as they drove on Lasley asked appellant if he had shot Hargett, to which appellant replied that he had put them every one right through the damn son-of-a-bitch; that they then drove by a route, which he described, to appellant's office, where they locked the door, put out the lights and held a short conference, agreeing to keep silent about what had occurred, and then separated.

Hargett's dead body was found in the street very shortly after the shooting. At least two of the bullets had passed through the chest, one going through the heart, and one had passed through his arm. The flesh and clothing about the wound in the arm were powder-burned. Either wound in the body would have been fatal. One bullet only had lodged in the body.

Next morning Lasley's car was examined. A bullet corresponding to the one taken from Hargett's body was found embedded in the upholstering of the back seat. Another had passed through the upholstering and the metal behind it, the hole in the metal showing that it was freshly made and by a bullet passing from inside to outside of the car. Blood stains were found on parts of the car beneath the floor boards, where it had evidently trickled through that part of the floor between front and rear seats. The car had been freshly washed inside between the front and rear seats, as had the floor mat covering that portion of the floor, but other parts of the car had not been washed recently. The door of Lasley's garage, which for a considerable time preceding the night of the homicide had been lying on the ground unused, was closed and wired shut. There is no room for doubt that Lasley's car was the one in which the murder was done.

For some time following the killing appellant was not suspected and during that time appeared to be trying to aid officers in their efforts to find out who committed the crime. He was arrested in January, 1928, the other two having been arrested previously. At the trial defendant denied participation in or knowledge of the offense. He and members of his family testified that he was at home at the time when the evidence shows Hargett was killed. The evidence relative to alibi was contradicted by evidence other than that of Fowler, offered by the State. By way of impeachment it was shown that appellant had been convicted of grand larceny in his youth, and of burglary when a young man, and he was shown to have made statements contradicting his testimony that he had not taken a drink on the day of the killing. Further facts will be noted in connection with the points to be discussed.

I. The indictment is challenged in the motion for new trial on the grounds that it does not state facts sufficient to constitute any offense and that it does not charge a conspiracy or agreement to kill deceased. It was not necessary to allege in the indictment that the crime therein charged was committed pursuant to a conspiracy. "Where a defendant is charged with the commission of a crime, the evidence of a conspiracy to commit crime may be shown, although the existence of the conspiracy is not charged in the indictment." [State v. Carroll and Jocoy, 288 Mo. 392, 407, 232 S. W. 699, and cases cited. See also State v. Ruck, 194 Mo. 416, 433, 92 S. W. 706, and cases cited; State v. Kolafa, 291 Mo. 340, 236 S. W. 302.] The indictment is sufficient. No motion to quash was filed and that ground of the motion for new trial seems to have been abandoned, as the point is not presented in appellant's brief or assignment of errors.

II.  The court gave instructions on murder in the first and second degrees, on the subjects of alibi, presumption of innocence and reasonable doubt, credibility of witnesses, and one properly limiting the purpose and effect of the evidence of former convictions of defendant.  There was also an instruction to the effect that defendant might be convicted on the uncorroborated testimony of an accomplice if believed to be true and sufficient to establish defendant's guilt, and warning the jury that such testimony should be received with great caution.

1.  Since defendant was not convicted of murder in the first degree it is not necessary to consider the instruction relative to that grade of offense.  The instruction on second degree murder is in the form often approved by this court and is not subject to adverse criticism.  The only complaint made of it is, first, that it should not have been given because if defendant was guilty of any crime it was murder in the first degree and no instruction should have been given on murder in the second degree, and, second, that it refers the jury to other instructions for the definition of certain terms and does not require the jury to find that  the killing was intentional.

Defendant cannot complain that he was convicted of murder in the second degree when the evidence showed him guilty, if at all, of murder in the first degree.  The error, if any, was in his favor and is not ground for reversal.  [State v. Billings, 140 Mo. 193, 41 S. W. 778.]  This instruction referred the jury to another instruction for the definitions of "wilfully," "premeditatedly," "malice," and "malice aforethought," all of which were appropriately defined in Instruction 1.  That was sufficient without repeating the definitions in Instruction 3, the one defining and submitting murder in the second degree.  The criticism that it does not require a finding that the killing was intentional in order to constitute murder in the second degree is wholly unwarranted.  It does not use the word "intentional," but it does require a finding that the killing was done wilfully, premeditatedly and with malice aforethought.  In Instruction 1, the jury is told that "wilfully means intentionally, not accidentally; premeditatedly means thought of beforehand for any length of time however short."  The jury was therefore instructed that the killing must have been intentional in order to justify conviction.

2.  Appellant assigns as error that the instruction given on the subject of alibi was insufficient and that his requested Instruction A

on that subject should have been given. The motion for new trial refers to an instruction numbered A on that subject and one numbered B relative to corroboration of the testimony of Fowler, requested by appellant and refused. But the bill of exceptions does not show any such instructions, nor that such instructions or any instructions whatever were requested by defendant, nor exceptions to the refusal of any instructions requested by appellant. Nowhere in the record is there any reference to such alleged request and refusal except inferentially in the motion for new trial and even there the alleged refused instructions are not set out. Neither is there any showing that defendant excepted to a failure of the court to instruct on all the law applicable to the case. Allegations in a motion for new trial do not prove themselves. Since there is no showing that such instructions were requested and refused nor as to what they were, if requested, they cannot be considered.

The court gave an instruction relative to the defense of alibi that was a replica of and doubtless was copied from the one given on that subject in State v. Williams, 309 Mo. 155, 183, 274 S. W. 427. In this case as in the Williams case this instruction was given in connection with one on reasonable doubt and presumption of innocence. In the Williams case authorities are cited and the instruction is held sufficient. For similar reasons we hold it sufficient in the instant case.

3. Appellant contends that the court failed to give a proper instruction on reasonable doubt. The instruction given was as follows:

"You are further instructed that the indictment contains the formal statement of the charge, but is not to be taken as any evidence of defendant's guilt.

"The law presumes the defendant to be innocent, and this presumption continues until it has been overcome by evidence which establishes his guilt to your satisfaction beyond a reasonable doubt; and the burden of proving his guilt rests with the State.

"If, however, this presumption has been overcome by the evidence and the guilt of the defendant established beyond a reasonable doubt, your duty is to convict.

"If, upon consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of his innocence."

The complaint made of this instruction in appellant's motion for new trial is that "it lays down a proper statement of the law and

120

gives undue prominence to a qualification which destroys the effect of the declaration." (Italics ours.) Appellant does not inform us either in the motion or in his brief what is the qualification he refers to. If he means the concluding portion, to the effect that a doubt to authorize an acquittal on that ground should be a substantial doubt touching the defendant's guilt and not a mere possibility of his innocence, the instruction on reasonable doubt with that qualification has been so long and so often approved by this court that it is needless to cite cases in support of it. In his brief appellant urges a different objection, viz., that the instruction so blends the subjects of presumption of innocence and reasonable doubt as to minimize the effect of any doubt which might have existed in the minds of the jury, and cites in support thereof State v. Douglas, 258 Mo. 281, 289, 167 S. W. 552, and State v. Clark, 147 Mo. 20, 38, 47 S. W. 886. It is doubtful whether appellant's motion for new trial presents that ground of objection, but we shall give appellant the benefit of that doubt and consider the point.

In the Douglas case there was in fact, as the court said, no instruction given on reasonable doubt, as required by statute, nor upon presumption of innocence. There was an instruction on the subject of *good character* which, after telling the jury in the usual manner to consider the evidence relative to good character and the presumption arising if good character was shown, concluded thus: ". . . but if you believe beyond a reasonable doubt from all the evidence in this case including that of good character that defendant is guilty on this charge his good character will not justify or excuse him." The Attorney-General argued that the reference to reasonable doubt in the above-quoted portion of that instruction was a sufficient instruction on that subject. The court held that defendant was entitled to a specific instruction on reasonable doubt, and that the instruction so blended the subjects of good character and reasonable doubt as to minimize the effect of any doubt which might have existed in the minds of the jury. In the Clark case an instruction was given on presumption of innocence, telling the jury that such presumption attended defendant throughout the trial and at the end entitled him to an acquittal "unless the evidence in the case, when taken as a whole, satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions." But there was no other instruction defining reasonable doubt and no specific instruction on that subject. The court held the failure to give an instruction on reasonable doubt was reversible error.

It is obvious that neither of the cases cited sustains appellant's contention. The instruction given in this case was clear and concise and was sufficient both on the subject of reasonable doubt and presumption of innocence. [See State v. Bond, 191 Mo. 555, 90 S. W. 830.] It also informs the jury that the burden of proving defendant's guilt rests upon the State, which answers another alleged error complained of in the motion for new trial.

III. Error is assigned in that the court gave an instruction (No. 6) to the effect that the jury might convict on the uncorroborated testimony of an accomplice if believed to be true and sufficient to establish defendant's guilt. The instruction further properly cautioned the jury as to how such testimony should be received. The instruction is unobjectionable in form and needs not be set out. Appellant's objection is not to its formal sufficiency, but he insists that Fowler was an alleged accomplice; that another witness, Crader, admitted that he had perjured himself at the coroner's inquest; that another, one Maxwell, was under indictment for driving a car while intoxicated and had been promised immunity for his testimony, and that defendant could not have been convicted without the testimony of these three witnesses; and that under such circumstances he was entitled to an instruction requiring the testimony of Fowler to be corroborated. Fowler was confessedly an accomplice of appellant's and was the State's principal witness. His testimony, if true, makes out a clear case against the appellant. Crader and Maxwell were not accomplices. Both at first attempted to deny knowledge of any facts relative to the murder or who committed it. Both gave testimony at the trial corroborating important parts of Fowler's testimony. Crader, it seems, had been threatened with prosecution for perjury for his testimony, either at the inquest or when first called before the grand jury. This threatened prosecution was abandoned after he had, as he claims, told the truth before the grand jury when his mother advised him to tell the truth if he had not done so. There had been a charge of driving a car while intoxicated pending against Maxwell which was dismissed when he testified at the first trial of this case. (There had been a previous trial in which the jury failed to agree.) But these matters only go to affect the credibility of the testimony of these witnesses. It is the well established law in this State that one charged with crime may be convicted upon the uncorroborated testimony of an accomplice if it is sufficiently convincing to the jury to establish his guilt. [State v. Bobbitt, 215 Mo. 10, 114 S. W. 511, and cases cited; State v. Shelton, 223 Mo. 118, 122 S. W. 732, and cases cited; State v.

Cummins, 279 Mo. 192, 209, 213 S. W. 969, and cases cited; State v. Craft, 253 S. W. 224, 228.] Since, therefore, the testimony of Fowler, if believed by the jury, was sufficient to authorize conviction, although not corroborated by any other witness, by what logic or reasoning must the jury be told that it *must* be corroborated because the State has offered corroborating evidence by witnesses who may have been discredited or impeached? If they had been the only corroborating witnesses and were discredited to the extent that their testimony amounted to nothing, the most that can be said of that situation is that there is no corroboration of Fowler's testimony which was legally sufficient if believed by a jury. If not so thoroughly discredited then the corroborating testimony adds something to that of the accomplice. There is no merit in this contention.

IV. In connection with Instruction 6, it is necessary to consider appellant's assignment of error that a conspiracy cannot be established by the testimony of one of the conspirators. Fowler, as has been stated, was a self-confessed accomplice of and coconspirator with appellant. He was not uncorroborated. There were numerous circumstances proven by other witnesses that tended to corroborate his testimony. But proof of the existence of a conspiracy was necessary in order to render competent against appellant certain statements which other witnesses testified that Lasley and Fowler had made. The credibility of that testimony was for the jury to determine. The jury was instructed that appellant might be convicted upon the uncorroborated testimony of an accomplice. Under that instruction if the jury disbelieved the corroborating testimony, but did believe Fowler's testimony without corroboration, it could still convict; and it might find upon Fowler's uncorroborated testimony that there was a conspiracy, thus making admissible the statements referred to. If, therefore, Fowler's testimony was legally insufficient to establish the conspiracy, Instruction 6 was error.

Appellant cites two cases in support of this assignment: State v. Loeb, 190 S. W. 299, 304, by this court, and State v. Gilmore, 151 Iowa, 618, 132 N. W. 53. The Gilmore case merely holds that the *declaration* testified to by a witness as having been made by an alleged co-conspirator is not sufficient to establish the alleged conspiracy as against the defendant on trial who did not make the statement and was not present when it was made, which is a different matter. As to the person on trial such *ex parte* statements of an alleged co-conspirator, the conspiracy itself not being shown by evidence at the trial, would be hearsay. But not so as to *testimony* given on the trial by a co-conspirator.

In State v. Loeb, supra, we think the court intended to hold only what was held in the Gilmore case. Two defendants, Loeb and Doss, were on trial charged with larceny. One Beckett testified to certain statements which he claimed had been made to him by Loeb, not in the presence of Doss, which tended to prove Loeb's connection with the crime and also to implicate Doss. The alleged statement of Loeb, as testified to by Beckett, constituted the only evidence connecting either defendant with the crime. Absent that alleged statement there was no evidence tending to show a conspiracy between Loeb and Doss. The court held that Loeb's statement tended to show active participation in the crime on his part if one had been committed, and was admissible against him, but as to Doss said:

"It remains to be determined, however, whether Loeb's *statement* was admissible against his co-defendant, Doss. To render it so it is necessary that there be evidence tending to show a conspiracy to commit the crime. . . . No *testimony* was offered either before or after the admission of the *statement* to show the existence of a conspiracy other than that which may be deduced from the statement itself. A conspiracy cannot be established by the testimony of a conspirator alone, but must be shown by other facts or circumstances independent of his statements" (citing State v. Gilmore, supra, and People v. Parker, 67 Mich. 222, 34 N. W. 720, 11 Am. St. 1. c. 580). (Italics ours.)

The court held that the testimony of Beckett as to Loeb's statement, while admissible against Loeb, was not admissible against Doss.

It will be observed that what the court was considering and deciding was not the competency or sufficiency of the *testimony* of a co-conspirator to establish the conspiracy, for there was no such testimony, but the admissibility of a *statement* or *declaration* of an alleged co-conspirator as against one not present when the statement was made and without any *testimony* tending to show that a conspiracy existed.

The case of People v. Parker, supra, like the Gilmore case, holds only that *statements* made by an alleged co-conspirator not in the presence of defendant "cannot be used to show the conspiracy without other independent evidence." Neither case cited holds that the *testimony* of a co-conspirator is insufficient to prove the conspiracy.

It is well established in this State that one may be convicted of crime upon the uncorroborated testimony of an accomplice. It would be anomalous to hold thus, and at the same time to hold that the conspiracy which is an incident to or means through which the crime charged was effected, cannot be so proved. We are satisfied that the learned writer of the opinion in the Loeb case used the

word "testimony" inadvertently when he meant to say "statement" in that part of the opinion above quoted. Otherwise that remark would be *obiter* because the question of the sufficiency of the *testimony* of a co-conspirator to establish the conspiracy was not involved in the case. The Loeb case should not be followed on that point.

V. Appellant makes numerous assignments of error in the admission and rejection of evidence.

1. The State proved over defendant's objection that Lasley and Fowler belonged to the Brotherhood of Railway Trainmen and that appellant had asked a witness for an application blank some two years previously which was not furnished because the request was not accompanied by a recommendation as required by the rules of the Brotherhood. Appellant later testified on his own direct examination that he did not and never had belonged to any union. His objection to the evidence of Fowler's and Lasley's membership is that it was immaterial. There was no error in admitting the evidence.

2. Error is assigned in the admission of the evidence as to seniority rights of employees of the Frisco and the J. L. C. & E.

**Seniority Rights.** railroads after the former began operating the latter, and to the fact that the Frisco was operating the J. L. C. & E. It is questionable whether the objection to this testimony was sufficient, but we think there was no error in the admission of the evidence. It gave the jury information as to the surroundings and situation relative to each other of the parties involved in the tragedy and tended to explain the feeling that seemed to exist on the part of appellant and his associates toward the deceased.

3. Appellant contends there was error in the admission of certain conversations between witness Clyde Maxwell and Lasley and Fowler and between John Crader and Lasley and Fowler, not in the presence of appellant. Maxwell testified that about seven P. M. on October 17th, shortly before the homicide, he saw and talked with Lasley near Horstman's rooming house, in which deceased had a room. At the time appellant was sitting in Lasley's car, which was parked in the street in front of this rooming house. Lasley asked Maxwell to go up and call Hargett and tell him that there was a meeting of some kind at the city hall and "they would pick him up as they went that way." Maxwell declined. Lasley then asked him if he had a gun, to which he replied that he had not, except a shotgun. Lasley then inquired if Maxwell had seen

John Hobbs, the city marshal, and Maxwell told him where he had seen Hobbs some thirty minutes earlier and Lasley went down that way. A few minutes later Fowler came along and asked Maxwell where Lasley had gone and Maxwell told him Lasley had gone down towards the corner. Fowler then invited Maxwell to come out to the car and have a drink. They went to Lasley's car, but were informed by appellant who was in the car that the whiskey had all been consumed, whereupon Maxwell and Fowler stepped "around back of the car" (appellant remaining in the car) and there Maxwell asked Fowler what they were going to do with Hargett when they got him. Fowler replied that it was none of Maxwell's damn business, all they wanted him to do was to go and call him.

Crader testified that between 6:45 and seven o'clock that evening Fowler, Lasley and appellant came to the Frisco office building where he, Crader, was employed as call boy. Fowler came into the hall, motioned Crader to come out of the office into the hall, and there asked him where Hargett was rooming. Crader told him, "In room four at Horstman's," and asked Fowler why he wanted to know. Fowler replied that Hargett was king of the scalies from Jonesboro. Fowler then went out to the car in front of the office in which appellant and Lasley were sitting and the three drove away. Fowler testified also to the conversations he had with Maxwell and Crader.

The testimony relative to the conversations above referred to was properly admitted because what was said by Lasley and Fowler was during the existence of the conspiracy and in furtherance of the purpose thereof. Before these conversations occurred Lasley, Fowler and appellant, according to the State's evidence, had agreed to take Hargett out that night and give him a whipping. At the time of the conversations they were obviously seeking him for the purpose of carrying out their prearranged purpose and these statements of Lasley and Fowler had direct reference to that purpose. The statements were therefore admissible against appellant, though not made in his presence. [State v. Shields, 296 Mo. 389, 402, 246 S. W. 932; State v. Samis, 296 Mo. 471, 486, 246 S. W. 956, and cases cited.] It is not necessary to consider in this connection whether or not the conspiracy contemplated the killing of Hargett. The State's case rests upon the claim, and its evidence, if true, shows, that appellant himself committed the murder. But, according to the State's evidence, the conspiracy did involve the unlawful purpose of forcibly taking Hargett from his room and subjecting him to the physical custody and control of the conspirators and thus became a means through which the crime charged was committed. The statements referred to had direct reference

to the above mentioned purpose of the conspiracy. For the same reasons the testimony of Fowler as to the conversation between himself, Lasley and Hargett in Hargett's room when Lasley and Fowler went there to get Hargett was admissible.

4. Appellant assigns error in the admission of certain other evidence as follows: Witness Crader was asked if he had made a statement to one Mitchell. Without objection he answered that he had. Appellant's objection to the next question as to what he had told Mitchell was sustained. After Fowler on cross-examination admitted that he had testified falsely at the coroner's inquest, denying any knowledge of the killing and testifying as to many things relative thereto contrary to his testimony at the trial, he was permitted to state on re-direct examination without objection, in answer to questions by the State's counsel, that before the inquest he had told his wife, his brother, J. W. Fowler, and his mother-in-law "about what he saw and knew of the killing." On re-cross examination appellant's counsel asked him if he had told them the truth about it, to which he replied that he had. Obviously he cannot now complain of error in the admission of this testimony, not having objected thereto.

In his brief appellant further assigns as error the admission of the testimony of J. W. Fowler who was permitted to relate what George Fowler had told him a day or so after the homicide and before the inquest, which corresponded with George Fowler's testimony at the trial. The objection as to J. W. Fowler's testimony is not saved in the motion for new trial and therefore may not be successfully urged here. But it would be unavailing had it been properly saved. George Fowler had been impeached on his cross-examination by showing that he had testified at the inquest contrary to his testimony on the trial. In addition, on his cross-examination, facts were elicited from him as to leniency and favors shown him by the officers in whose custody he was after his arrest, from which an inference was sought to be drawn that he had been promised leniency in the case against him, or at least that he expected such leniency, as a reward for testifying against appellant. In these circumstances the State had the right, in order to rehabilitate his testimony, to prove that before he testified at the inquest and before the alleged or intimated improper influences could have operated upon him, he had made statements consistent with his testimony at the trial. [State v. Sharp, 183 Mo. 715, 82 S. W. 134; State v. Maggard, 250 Mo. 335, 157 S. W. 354, and cases cited; State v. Tippett, 296 S W. 132.]

5. Appellant offered to prove by George Fowler on cross-examination that after his (Fowler's) arrest and while in custody, bail having been denied, Fowler was accorded privileges and shown favors and considerations not usually accorded prisoners; this for the purpose of proving or raising an inference that Fowler had been promised, or that he expected, leniency in his own case in return for testifying as he did. When appellant first sought to cross-examine Fowler along this line the court sustained the State's objection thereto. But the next morning the court informed counsel that he had reconsidered and would permit appellant to cross-examine fully on that matter and Fowler was thereupon recalled and appellant was permitted to and did cross-examine him as fully as he desired to upon that subject. Any error in the rejection of the evidence when first offered was cured by its subsequent admission. The further contention that the court's remark in rejecting the evidence when first offered was prejudicial is without merit.

Neither do we think there was error in the court's refusal to permit defendant to testify that in 1923, when he was first employed by the Frisco at Springfield, Missouri, there was a shopmen's strike in progress at that place and that non-union men had taken the place of union men in the shops and that his duties then were to protect the non-union men against the strikers. It was remote in time and had no connection with the situation existing at the time of the homicide nor with deceased. The offer of proof did not include an offer to prove that he had in fact discharged such or any duties in connection with his employment at Springfield. We do not see how the fact offered to be proved could have thrown any light on the subject of motive or any other question involved in the case. As to its tending to rebut the inference that he belonged to the Brotherhood of Railway Trainmen, as suggested by appellant, the State not only made no such claim, but in effect proved that he did not belong.

Appellant complains that he was not permitted to testify that after the murder and before his arrest he was honestly endeavoring to find out who committed the murder. He was permitted to and did testify as to his acts and conduct in that connection. His statement that he was honestly endeavoring to find out who committed the murder, besides being in the nature of a conclusion, could have added nothing to the effect of his evidence.

6. It is contended that the court erred in permitting defendant's witness Stokely to be "cross-examined from testimony taken at the coroner's inquest." The reason assigned in the motion for new trial is that it had not been identified as part of such testimony. At the trial Stokely was called as a witness for defendant. His testimony in numerous particulars contradicted that given by him at the inquest. His testimony at the inquest had been reduced to writing and signed by him and at the trial he admitted his signature. On cross-examination his attention was called to certain questions put to him and his answers at the inquest which contradicted his testimony on the trial. Some he admitted, others he either denied or said he did not remember. No objection was made to any of this examination. In rebuttal the State was permitted to read in evidence the questions and answers about which the witness had been specifically asked on his cross-examination. This was offered and admitted for the purpose of impeachment. Then for the first time appellant objected on the ground that "where testimony is taken against a defendant he has the right to face the witness and the defendant in this case did not face the witness on this examination and the testimony cannot be used for that reason." Appellant now urges this ground of objection in his brief, citing one Missouri case, State v. Mullins, 101 Mo. 514, 14 S. W. 625, and several from other states, none of which sustain his contention. There can be no doubt that the testimony given by Stokely at the inquest which contradicted that given by him at the trial was properly admitted to impeach his testimony at the trial. [State v. Eastham, 240 Mo. 241, 144 S. W. 492.] The reading of some questions and answers which the witness had admitted on his cross-examination was not objected to on that ground.

7. It is urged that error was committed in admitting in evidence the sheet taken from Hargett's bed, and State v. Creed, 252 S. W. 678, and State v. Pearson, 270 S. W. 347, are cited in support of the contention. In those cases the bloody clothing worn by each of the deceased at the time he was killed was introduced and exhibited to the jury. In each case under the facts shown the clothing could serve no evidentiary purpose and could only tend to inflame the minds of the jurors, and its admission was held to be error. But if such evidence tends to throw light on a material matter at issue it is admissible. The clothing of deceased in the instant case was not admitted and was not even produced in the court room. The sheet was admitted. It is not correct to characterize it as a bloody sheet as appellant does in his brief. There were only two or three small

blood spots on it, each about the size of a dime, and these could hardly have aroused passion in the minds of the jurors. These spots and the location thereof on the sheet tended to throw light on what occurred in Hargett's room and to corroborate Fowler's testimony. These were not admitted facts. As said in State v. Porter (Mo.), 207 S. W. 774, 777:

"Demonstrative evidence of this character is admissible if it tends to connect the accused with the crime . . . or throw any relevant light upon a material matter at issue. [Citing cases.] Necessarily, the admission of this character of testimony must, within the limits stated, be left largely to the discretion of the trial court (citing cases) and only when it appears that this discretion has been abused will we interfere therewith."

See also State v. Hopkins, 278 Mo. 388, 394, 213 S. W. 126.

Error is assigned in the admission of proof by Crader and Maxwell of statements made by Lasley and Fowler before, as appellant contends, there was any proof of a conspiracy. While as a general rule there should be proof of a conspiracy before the acts or declarations of a conspirator can be admitted against his co-conspirator, the rule is not inflexible. The order of proof rests largely in the discretion of the trial court. [State v. Walker, 98 Mo. 95, 9 S. W. 646; State v. Flanders, 118 Mo. 227, 23 S. W. 1086; State v. Reich (Mo.), 239 S. W. 835; State v. Parr, 296 Mo. 406, 246 S. W. 903; State v. Gilmore, supra.] Evidence of circumstances from which an inference might be drawn that the three were acting in concert had been introduced. Fowler had not yet testified but later was called and his testimony furnished direct evidence of the conspiracy. There is nothing in the record to indicate that the court abused its discretion, or that the order in which the evidence was introduced could have prejudiced the defendant.

VI. Appellant challenges the verdict on the ground that it was arrived at by the jury by chance and self-imposed coercion, in that the jurors agreed that each would set down the length of term of imprisonment he thought should be imposed, the aggregate of the figures to be divided by twelve and the quotient to be the term of imprisonment imposed. He filed with his motion for new trial affidavits of five of the jurors to that effect. He also filed the affidavit of a deputy sheriff stating in substance that a few minutes after the return of the verdict he, the deputy, found in the jury room a slip of paper, filed as an exhibit with the affidavit, on which appears a column of figures ranging from 10 to 99, giving a total of 526 and an apparent division by twelve with a resultant quotient of forty-three.

The jurors' affidavits were by the court stricken from the record, and properly so, and cannot be considered. A juror cannot be heard to impeach his own verdict. [State v. Branstetter, 65 Mo. 149, and cases cited; State v. Linn, 223 Mo. 98. 110, 122 S. W. 679, in which the same contention was made as in this case.] The figures on the slip found by the deputy sheriff were not shown to be in the handwriting of any member of the jury. With the jurors' affidavits stricken out there was no showing that the jurors had agreed in advance to adopt as their verdict the quotient resulting from dividing by twelve the aggregate of the numbers set down on the exhibit. If they did so agree and did make the calculation they must have abandoned the agreement after the calculation was made and then agreed upon forty-three years, because 526 divided by 12 does not produce a quotient of forty-three. It produces 43 10/12, that is, forty-three years and ten months, expressed in terms of time. It has been held that if the jurors have not bound themselves in advance to accept the unascertained quotient as their verdict, but after the quotient is ascertained they adopt it as their verdict, the fact that they fell upon that method of reaching an agreement will not vitiate their verdict. [Thompson v. City of Lamar (Mo.), 322 Mo. 514, 17 S. W. (2d) 960, 977, and cases cited.] The facts developed in State v. Linn, supra, were substantially identical with those shown here and were held insufficient to overthrow the solemn verdict of the jury. We so hold in this case.

We have considered the many assignments of error made by appellant and have carefully examined the record and find no reversible errors therein. Appellant appears to have had a fair trial and the verdict is supported by substantial evidence. The judgment is affirmed. *Davis* and *Henwood, CC.*, concur.

· PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted ·as the opinion of the court. *Blair, P. J.*, and *White, J.*, concur; *Walker, J.*, absent.