STATE of Missouri, Respondent,

v.

Charles W. GARTON, Appellant.

No. 49570.

Supreme Court of Missouri,

Division No. 1.

Sept. 9, 1963.

Rehearing Denied Oct. 14, 1963.

284

No attorney for appellant.

Thomas F. Eagleton, Atty. Gen., Jefferson City, Theodore C. Beckett, Sp. Asst. Atty. Gen., Kansas City, for respondent.

DALTON, Presiding Judge.

On March 16, 1962, an amended information was filed in the Circuit Court of Platte County, Missouri, charging defendant Garton, under the Habitual Criminal Act, with the crime of robbery in the first degree by means of a dangerous and deadly weapon. See Secs. 560.120 and 560.135 RSMo 1959, V.A.M.S. and Sec. 556.280 RSMo, as amended Laws 1959, S.B. No. 117, Sec. 1, V.A. M.S. The cause was transferred to An-

drew County for trial. Defendant appeared in open court with counsel of his own choosing and waived formal arraignment and entered a plea of "not guilty." The amended information charged two prior felony convictions, to wit, Grand Larceny and Assault With Intent to Commit Murder and the court so found. After the jury returned a verdict of guilty, as charged in the amended information, the court assessed defendant's punishment at life imprisonment in the Missouri State Penitentiary. A motion for a new trial was filed and overruled and defendant was permitted to appeal as a poor person and a free transcript has been provided.

We shall examine the assignments of error in defendant's motion for a new trial. Supreme Court Rule 28.02, V.A.M.R.

The charge in question was based upon defendant's alleged participation, as a principal, along with Joe Andrews, in the robbery of Mike Jarowitz, the Cashier of the Farley State Bank of Farley, Platte County, Missouri, on September 1, 1961, when some $13,613 in money, the property of the Farley State Bank, in the custody of Jarowitz as cashier, was taken and carried away. Jack Streater, a witness for the State, participated in the robbery by driving the get-away car and sharing equally in the proceeds of the robbery.

The State's evidence tended to show that on said date, at about a quarter after nine in the morning, a 1960 white Pontiac automobile was seen to approach the Farley State Bank in Farley, Missouri, at a slow rate of speed. Just as the automobile got to a point in front of the bank, two individuals, later identified as defendant and Joe Andrews, jumped out of the car and came into the bank. Defendant was carrying a canvas bag and both he and Andrews had a type of make-up on their faces and each wore gloves, a dark hat, dark glasses and a khaki shirt and trousers. Both men displayed snub-nosed revolvers and one of them advised the bank employees that, "This is a holdup, everybody do as we say

and nobody will get hurt." Jarowitz and other employees were ordered into the bank vault. Defendant accompanied Jarowitz into the bank vault and cautioned him not to reach for a gun. He also ordered Jarowitz to place the bank's currency in the canvas bag, which was done. Defendant took the currency and a sack containing 645 silver dollars with him. The two robbers left the bank together and entered the white Pontiac, which Jack Streater held in readiness to provide a way of escape.

Jarowitz identified defendant as one of the robbers and Joe Andrews as the other. Defendant was also identified as one of the robbers by June Graham, a bookkeeper, and by Laverne Taulbee, a secretary at the bank.

After defendant and Andrews were picked up, Streater drove the Pontiac out to a place about two miles away where Streater's DeSoto had been parked. All then abandoned the Pontiac and entered Streater's DeSoto and he drove on to a place where a metal box containing soft drinks had previously been placed near a certain cottonwood tree. When the robbers left Streater's car, they took the proceeds of the robbery with them and went into a wooded area. Streater then went to his farm home and took his wife to her work in Kansas City and he went on to his place of employment. After work that evening he returned to his farm and later that night he returned to the cottonwood tree, picked up defendant and Andrews and took them into Kansas City. The robbers told Streater that they had obtained thirteen thousand, six or eight hundred dollars. They split up the currency while they were in the woods, and left some 600 dollars of silver in a hollow tree. Defendant was given his full share, but Andrews and Streater were to divide later. Streater was to get one-third, as he subsequently did when the money was divided at an apartment in Kansas City. Streater then took $3,000 of Andrews' share back to the farm that night. The next day Andrews came out and got $1,000 of the money and buried or hid the balance. After the robbery, Streater continued working at

his job at the Butternut Bakery for about three weeks and then he took a trip to Bennett Spring and on to Miami, Oklahoma, before he returned to his rented farm some fifteen miles from Farley, Missouri.

On September 30, 1961, Streater went to Kansas City to get a couple of sacks of coal. About 5 p. m. he saw two police cars parked underneath a bridge carrying an expressway over Southwest Boulevard. He pulled up to ask them where he could find a coalyard. He had a hunting knife on his belt and the officers, in some manner, saw the knife and, after telling him where a coalyard was located, they arrested him, took the knife and searched the car, wherein they found $2,530 of the bank's currency in a paper sack in the glove compartment. Streater told them the money was from gambling, working and savings. Some three weeks later, he admitted his part in the robbery and took several officers to the cottonwood tree and wooded area referred to. The officers searched for the hollow tree and found it and an olive-colored bag. The bag contained 637 silver dollars, a sawed-off shotgun and a snub-nosed .38. The shotgun, with the barrel and stock sawed off, appeared to be similar to the shotgun that had been left in the white Pontiac while the robbery took place. Streater identified defendant at the trial as one of the men with whom he had cooperated in the robbery at the Farley State Bank on September 1, 1961.

The evidence further tended to show that, prior to August, 1961, Streater resided at 10 East 32nd Terrace in Kansas City, Missouri, near where Andrews and the mother of Streater's wife resided. Streater subsequently rented a farm on Route 2, Parkville, and took possession of the house and began repairs sometime in August. The bank robbery was first mentioned to him by Andrews about the middle of August. The conversations began at Streater's apartment in Kansas City and were later carried on in Andrews' apartment. Andrews had visited the Farley State Bank about the middle of August and had asked to see one

of the Farleys, who was not present. The robbery was first scheduled for the 25th of August and Streater was to receive a minimum of $1,000 or more depending on what they got. Defendant was present when the plans were discussed and he told Streater "there wouldn't be anything to it." Andrews said the robbery had been planned about four months and that Streater didn't need to be within ten miles of the bank when it was robbed, since Streater, using his own car, was just to pick up defendant and Andrews at a designated spot. Later, defendant and Andrews said they would get another car and let Streater know when they were ready to proceed. When they did notify him they said they wanted to use Streater's car to obtain a get-away car, because Andrews' car was an old '48 Nash and they didn't want to drive it; however, they got a car themselves, a white 1960 Pontiac. It was taken from the Plaza in Kansas City to Streater's farm on Tuesday or Wednesday before the 25th of August. On the 25th, Streater picked up defendant and Andrews at Andrews' apartment in Kansas City, about 10:30 a. m., and brought them out to Streater's farm. They then applied "a pancake make-up" to their faces. A place was agreed upon where Streater was to wait for them and pick them up in his DeSoto when they returned from the bank.

Defendant and Andrews left Streater's farm about 4:30 p. m., in the white Pontiac, each carrying a .38 snub-nosed revolver. At about 4:45 p. m. Streater went over to the designated spot to wait. When they returned they told him that it looked like all the town was there and they didn't think it was "a good deal" to proceed. Both cars were then driven back to the farm and the Pontiac was parked behind a garage in a bunch of weeds. Later, Streater took defendant and Andrews back to Kansas City in his DeSoto. Defendant was angry because the robbery didn't "come off," since he had come in from Hobbs, New Mexico and had spent considerable money. Defendant talked of leaving Kansas City, but Andrews wanted him to stay and try again

the following Monday. Defendant said he would have to call his wife "and find out." On Wednesday or Thursday of the following week, between the 25th and the 1st, Streater saw the defendant in Andrews' apartment in Kansas City and defendant and Andrews both advised him that the robbery was set for Friday morning, September 1. It was decided that the robbery would take place as soon as the bank opened instead of waiting until evening. In the meantime Andrews came to the farm and moved the Pontiac down near a certain bridge and Streater went along in his DeSoto to bring Andrews back to the farm. The Pontiac was parked about two miles from Farley. Andrews then went back to Kansas City in his own car and, at 7 o'clock the following morning, September 1, 1961, Streater went into Kansas City and picked up defendant and Andrews at Andrews' apartment, where he found them partially "made-up" with their pancake make-up, and spraying their hair. They then "headed for" the parked Pontiac in Streater's DeSoto. When they reached the place where the Pontiac was located, they parked the DeSoto and put the guns in an "army-colored" bag and took the two snub-nosed .38's, all loaded, and Streater drove the white Pontiac into Farley where, as stated, he let the two others out in front of the bank and came back a few minutes later and picked them up as they were leaving the bank after the robbery. Streater had met defendant in Kansas City through Andrews in June or July, 1961, but he saw defendant five or six times between August 15 and September 1, 1961.

We need not review defendant's evidence further than to say his defense was an alibi, to wit, that he was in Hobbs, New Mexico on September 1, 1961.

■ No issue has been raised as to the sufficiency of the evidence to make a case for the jury; however, we find it sufficient.

In the motion for a new trial the defendant states that "the Court erred prejudicially in consistently permitting sundry State's witnesses to testify as to the plans and activities of the defendant and others concerning a 'conspiracy' and abandoned plan to rob the Farley State Bank on August 25, 1961. The Court further permitted testimony of conversations between witness Streater and one Joe Ward Andrews, remote in time, out of the presence of this defendant and not binding upon him, and concerning matters unrelated to the trial issue herein joined."

This assignment does not point out with particularity the precise testimony objected to and it does not, therefore, comply with Supreme Court Rule 27.20; however, a careful reading and re-reading of this entire record tends to show that there was no abandonment of the original plan to rob the Farley State Bank, but only that the time for the robbery was delayed to a more opportune time. The date for carrying the plan into execution was incidental to the plan. The defendant did not necessarily stay in Kansas City during the entire interval between August 25 and September 1, but there was no evidence of abandonment of the original plan, to wit, to rob the particular bank. It is true that a few days after the 25th, when a new date had not been agreed upon, Streater became nervous about the white '60 Pontiac that was parked in the weeds behind his garage. He told Andrews that he was going to get rid of it by calling the State Patrol and telling them a car had been left on his farm and that he knew nothing about it. Andrews said, "No, wait", that defendant (Garton) was coming back and was "in on it" for Friday, September 1, as soon as the bank opened. Accordingly, Streater drove into Kansas City on that date and got defendant and Andrews and brought them out to the place where the white Pontiac, which was to be used in the robbery, had been parked by Andrews. The DeSoto was parked there and all got in the white Pontiac and "headed" for the bank.

■ Since it appears from the record that there was a definite and continuing

conspiracy to rob the particular bank and that the plan was, with reasonable promptness, carried into execution, all of the statements and acts of the co-conspirators, made in the furtherance of the conspiracy, were properly admitted in evidence for the purpose of showing the commission of the offense for which the conspiracy was designed. State v. Johnson, Mo.Sup., 286 S.W.2d 787, 792[6–10]; State v. Rosegrant, 338 Mo. 1153, 93 S.W.2d 961, 974[27]; State v. Deyo, Mo.Sup., 358 S.W.2d 816, 823[V].

Another assignment of error in the motion for a new trial is that, "the Court erred in failing to give, sua sponte, an accomplice instruction with the testimony of witness Streater being the most formidable nexus in placing the defendant as a participant in the crime charged. An accomplice instruction was thus a part of the law of this case."

■■ Again we have an assignment that does not comply with Supreme Court Rule 27.20 requiring errors to be set out specifically and in detail. The motion in no way indicates the precise instruction the defendant would have had the court to give and, therefore, the entire allegation of error is vague and uncertain; however, if we assume, in the absence of a more definite statement, that the instruction, which defendant asserts the court should have given "sua sponte", was "the usual and ordinary cautionary instruction" often given to guide a jury in determining the weight and value of the testimony of an accomplice, if there is such a thing as a usual and ordinary instruction, then we may say (1) that the record fails to show that the defendant made any request for such an instruction; and (2) that the court was not bound of its own initiative to instruct upon the subject. In this case such an instruction concerning the jury's consideration of Streater's testimony would have been purely cautionary and collateral to the principal issue involved in the case. Such an instruction does not concern a question of law necessary for

the jury's information in giving their verdict. See State v. Mahan, Mo.Sup., 226 S.W.2d 593, 595[2]. Further, in this case the defendant was positively identified as one of the robbers by three of the employees of the bank who were witnesses in the case and testified before the jury. No such an instruction, as claimed, was required to be given. State v. Emrich, Mo. Sup., 250 S.W.2d 718, 725[9]; State v. Turner, Mo.Sup., 272 S.W.2d 266, 271[13]; State v. Rutledge, Mo.Sup., 267 S.W.2d 625, 626[5–6].

In the case of State v. Chaney, Mo.Sup., 349 S.W.2d 238, 245, the court said: "As to any question collateral to the main issue, it is reasonable and logical to require submission of an instruction on the subject by counsel for defendant who has prepared and conducted the defense. Otherwise, too great a burden would be placed on the trial judge by requiring him to try to think of all possible collateral issues and prepare instructions on them. The duty rests on counsel for the defendant to aid and not ambush the court. See State v. Conway, * * * 241 Mo. loc. cit. 288, 145 S.W. loc. cit. 447. Therefore, counsel should be required to call to the attention of the court any collateral question considered to be of importance to the defense by offering an instruction covering it."

No such instruction was requested. The assignment of error is overruled.

■ Defendant further assigns error on the giving of Instruction No. 6 to the effect that all persons are equally guilty, who act together with a common intent in the commission of a crime. The instruction further states the law as to "aiders and abettors." Defendant says that "Such an instruction, while a familiar principle in the abstract, was not applicable to the State's charge against this defendant"; and that "the instruction improperly charged the jury on the law of co-conspirators, when the State's theory and verdict directing instruction had already been set

forth in Instruction No. 5, * * * wherein the defendant was to be found guilty as a principal" under the facts submitted.

In the information and by Instruction No. 5 the cause was charged and submitted against defendant as a principal, as is set forth by Sec. 556.170 RSMo 1959, V.A.M.S., providing that an accessory to a felony may be charged, tried, convicted and punished in the same manner, as a principal in the first degree.

Essentially, Instruction No. 6 was a cautionary instruction which further contained the following statement: "However, the mere presence of one at or near the scene of a crime, does not render that person liable as a participator therein. If one is only a spectator, innocent of any unlawful act or criminal intent, and does not aid, abet, assist, advise or encourage another or others in the commission of a crime, that person is not liable as a principal or otherwise, and should be acquitted."

█ We find no prejudicial error in the giving of Instruction No. 6, nor do we find any conflict between this instruction and the charge and submission of the cause against defendant as a principal. While the evidence tends to show that defendant and Andrews were principals in the mentioned robbery, it was not error for the court to give an instruction as to "aiders and abettors."

In the case of State v. Lunsford, Mo. Sup., 331 S.W.2d 538, 540, 541, this court said: "The evidence was quite convincing that the defendant was present and participated in the offense. In a practical sense, each was an aider and abettor because the evidence tended to prove that the defendant and his companion both committed overt acts during the progress of the assault which resulted in the death of Wesley Huson.

"Even though the evidence tended to prove that the defendant was the actual killer, it is not inconsistent or misleading

for the state to instruct on the theory that the defendant was an aider and abettor as well as the actual killer because the greater participation in the offense includes the lesser and the legal effect is the same. State v. Millsap, 310 Mo. 500, 276 S.W. 625, 628[5]."

On the record before us, Instruction No. 6 did not impose a greater or different responsibility on defendant than justified by the law and the evidence. Instruction No. 6 may have been unnecessary, but the defendant could not have been prejudiced by it. The assignment of error is denied.

Only one further assignment of error appears in the motion for a new trial. It is as follows: "The Court erred in refusing to permit the defense to examine the signed statement of witness Jack Streater after he had testified against this defendant."

The record discloses that during the cross-examination of State's witness Streater, when it appeared that he had given a written and signed statement to Sgt. Laurie of the State Highway Patrol, the defendant's counsel promptly made an oral demand on "the prosecuting attorney" for "a copy or review" of the statement. Defendant's counsel stated that the demand was made under the federal rules of procedure and referred to the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103, which involved rules of procedure and evidence in the federal courts. Counsel stated that he wanted the statement for the purpose of impeachment so that the "witness could not change his story"; and that counsel had no knowledge of the existence of such a statement until the fact was developed on cross-examination.

There was evidence that the statement concerned the facts, as stated by Streater, with reference to the robbery of the Farley State Bank on September 1, 1961; and that it was the only written statement Streater had given and signed. There was no evidence tending to show that Streater had ever made any statement inconsistent

with his testimony at the trial. The court denied the request and counsel continued with the cross-examination of the witness.

■ It will be noted that the assignment of error in the motion for a new trial merely asserts that the court erred in refusing defendant's request. It does not set forth any specific ground for the asserted error. Supreme Court Rule 27.20; State v. Sheard, Mo.Sup., 276 S.W.2d 191[1, 2]. In the motion for a new trial, after the stated assignment of error, the motion does contain statements tending to show that it was defendant's theory that the reasons, which the court assigned for denying the oral request for the production of the mentioned statement, were in fact erroneous. However, if the trial court reached a correct decision on the issue presented it is immaterial that the court may have assigned an erroneous or insufficient reason for the action taken. City of St. Louis v. Evans, Mo.Sup., 337 S.W.2d 948, 954[2]; Brown v. Moore, Mo.Sup., 248 S.W.2d 553, 556[4–6].

■■ Defendant has failed to establish reversible error in this regard, first, for the reason that this assignment of error does not set forth any specific ground or reason why the court erred in refusing to require counsel for the State to produce, for defendant's inspection, Streater's written and signed statement concerning happenings in connection with the robbery on September 1, 1961. State v. Gilliam, Mo. Sup., 351 S.W.2d 723, 727[12]. In the second place the application was oral and there was no evidence in the record tending to show that there was any conflict between Streater's statement and his testimony at the trial, or that the statement would have been admissible for any purpose. Under a somewhat similar situation, this court in the case of State v. Redding, Mo.Sup., 357 S.W.2d 103, 109[17], stated:

"We are unable to tell from the motion for a new trial or the oral request whether reliance was placed on § 510.030 appearing in our Civil Procedure, or on Criminal Rule 25.19. The latter presupposes the issuance of a subpoena duces tecum, and none was shown here. In State v. Kelton, Mo., 299 S.W.2d 493, the court said, loc. cit. 497: 'Assuming, without deciding, that defendant would have the benefit of Section 510.030 RSMo 1949, V.A.M.S., pertaining to the production of documents and papers in civil cases, she did not bring herself within the terms of the statute. The application was oral and there is no showing that the written statement contained evidence material to the merits or defense of the action. "A mere suspicion that it contains such evidence does not warrant an order for its production." State ex rel. Page v. Terte, 324 Mo. 925, 25 S.W.2d 459, 462[2, 3]. The production of books and papers under the statute "is not authorized upon the possibility of the impeachment of witnesses or for prying into an adversary's preparation for trial." State v. McDonald, 342 Mo. 998, 119 S.W.2d 286, 289[6].' See also State v. Brown, 360 Mo. 104, 227 S.W. 2d 646. And a somewhat analogous situation was discussed very recently in State v. Crayton, Mo., 354 S.W.2d 834."

The assignment of error is overruled.

■ We have further reviewed those record matters not required to be preserved in the motion for a new trial, which matters we examine irrespective of whether they are questioned in the motion (Supreme Court Rule 28.02), and we find no error therein prejudicial to defendant.

The judgment is affirmed.

All concur.