**STATE of Missouri, Respondent,**

v.

**Loretta Ollison DANFORTH, Appellant.**

**No. WD 32799.**

Missouri Court of Appeals,
Western District.

March 29, 1983.

As Modified June 28, 1983.

Application to Transfer Denied
Aug. 16, 1983.

Solution to a Statutory Dilemma," 45 U.Pa.L.    Rev. 809, 835 (1982).

John C. Milholland (argued), Cenobio Lozano, Jr., Harrisonville, for appellant.

Theodore A. Bruce (argued), Asst. Atty. Gen., John Ashcroft, Atty. Gen., Jefferson City, for respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

Defendant was convicted by a jury of conspiracy to commit capital murder, § 564.016,[1] and was sentenced to ten years imprisonment. On appeal, she contends that § 564.016 is unconstitutionally vague, that the statute does not make conspiracy to commit capital murder a crime, that much of the state's evidence was hearsay and inadmissible, and that the jury instructions were erroneous. We affirm.

On August 22, 1980, the decaying body of Dr. Duncan Danforth, a wealthy 75-year-old retiree, was found fifteen feet off a rural road between Greenview and Climax Springs, in Camden County, Missouri. Dr. Danforth had been shot in the head and chest, and had died from the head wound.

---

1. All sectional references are to Revised Statutes of Missouri, 1978.

He had last been seen on the night of August 17, 1980, just four days after marrying the 22-year-old defendant and revising his will to make her a beneficiary of his estate.

On October 7, 1980, the defendant was charged by information with conspiracy to commit capital murder. The information named Jack Pearcy, Harrison D. Williams and Mike Stith as her co-conspirators.

■ The facts surrounding the alleged conspiracy to murder Dr. Danforth are both complex and disputed. We begin our recitation of the facts, then, by noting the rule that where the evidence conflicts in a criminal case, the jury's findings are conclusive. *State v. Johnson,* 55 S.W.2d 967 (Mo.1932). We may neither weigh the evidence nor determine the credibility of witnesses. *State v. Williams,* 376 S.W.2d 133 (Mo.1964). The jury's determination of the facts based on conflicting testimony must be accepted by this court. *State v. Keck,* 389 S.W.2d 816 (Mo.1965).

The facts of this case, consistent with the jury's verdict, are as follows. In July, 1979 Loretta Danforth (then Loretta Ollison) met Mike Stith and began dating him later that year. Mr. Stith moved in with the defendant and her mother, and continued to live in their home through the events of August, 1980. Defendant was observed by Mr. Stith's aunt as late as August 17, 1980, sitting on his lap and "showing affection" for him.

In early August, 1980 Mr. Stith called Harrison Williams and told him he was looking for someone to "rough up" an "old man that was givin' him a hard time." Mr. Williams asked his friend Jack Pearcy to help in this endeavor, and the two men met Mr. Stith on the morning of Tuesday, August 12, to discuss the plan. At that meeting, Mr. Stith had with him a female companion to whom he referred as his girlfriend, identified at trial by Mr. Pearcy as the defendant, who waited in the car while the three men conversed. Mr. Stith gave the men an envelope containing $1500, a map to the Breckenridge Inn in Kansas City, Missouri, a photograph of Dr. Danforth, and a photograph of the doctor's car.

For the first time, he informed the men he "wanted the old man killed," and he wanted it done that night. Mr. Pearcy and Mr. Williams said it could not be done that soon and that more money ($4,000 altogether) would be required if murder were involved. Mr. Stith then said that since Mr. Pearcy and Mr. Williams couldn't be there on Tuesday night, "they would make plans" to go to the Breckenridge Inn in Kansas City the next night, August 13, where the defendant and Dr. Danforth would be honeymooning. The defendant would send her husband out to the parking lot of the hotel at 9:00 p.m., and the men would kill him at that time.

The next day, August 13, Dr. Danforth and the defendant were married. They immediately went to the office of the doctor's attorney to revise his will before continuing on to the Breckenridge Inn where Mr. Pearcy and Mr. Williams were waiting in the parking lot. What followed was a macabre comedy of errors.

As had been arranged, the doctor emerged from the building, not once but twice. Rather than kill him, the two men decided that the many windows in the hotel, the people in the area, and the well-lighted parking lot made the plan unworkable. After Dr. Danforth's second trip outside, the two went to the hotel lounge, saw the defendant, and informed her that they could not do it as planned. She told them the murder had to be done that night before she had to go to bed with her husband, that Mr. Stith needed money and that this was the only way he could get it. Twice more, Dr. Danforth visited the parking lot and twice more the two men decided the plan was unwise. Once again, they talked with the defendant who told them she would drive with her husband to a nearby McDonald's restaurant and leave him in the car with the keys in the ignition. The men were to jump in the car, kill him and drive away, being careful not to get blood on the car which would soon be the defendant's. They agreed and followed the couple to McDonald's. Again, they decided too many people were around. Mr. Pearcy talked with the defendant inside the restaurant and told her they could not kill her husband

there. She suggested that the two sneak into the hotel room and kill him with his own gun when the couple returned. Mr. Pearcy and Mr. Williams got as far as the hotel room door, decided that a shot would be heard throughout the hotel, and abandoned the plan. Again, they met with Mrs. Danforth, driving around with her while the three of them "came up with the idea" of killing the doctor the next day. During the drive home on August 14, Mrs. Danforth was to persuade her husband to stop the car along the highway, giving Mr. Pearcy the opportunity to force his way into the car and kill him. The two men thought better of the idea in the morning.

On Friday, August 15, the men met once again with Mike Stith, who drove them to the Ollison residence (the home of Loretta Danforth and her mother).[2] Dr. Danforth was expected there for dinner that evening, and the two were to attack him at the front gate. Mr. Stith then drove the men to an old road, Kolb Hollow Road, and showed them where they could dispose of the body. That night, the two men decided that the plan was bad, and Mr. Pearcy decided to stand along Kolb Hollow Road and shoot the doctor as he drove by. However, when the opportunity came to shoot Dr. Danforth, Mr. Pearcy did not do so because the night was too dark and he didn't want to shoot "nobody that he wasn't supposed to."

On the following day, August 16, Mr. Stith showed Mr. Pearcy and Mr. Williams a rifle which they could use to kill the doctor. He also showed them where the doctor lived and informed them that the only other person who lived along the drive was a senile old woman who would pose no problems. When the two drove down the road later, however, they ran into the woman, Mrs. Vivian Scott, who asked them what they were doing, told them to leave, and wrote down their license plate number. Discouraged at last, Mr. Pearcy and Mr.

Williams decided to give up and return to their homes in Olathe.

On August 17, Mrs. Danforth drove Mr. Stith to an aunt's home in Eldon, Missouri, where the two were observed displaying their affection for each other. Later that day, another of Mr. Stith's aunts, Angela Knoll, gave him a ride back to Climax Springs, during which he asked her if she would provide him with an alibi. Once they reached Climax Springs, he had her drive past the Ollison residence, let him out, drive through town and return to pick him up. On her return to where she had left him, a gray truck passed by, driven by an old man. Mr. Stith ducked down in his seat and told her this was the man he had been waiting for. As requested, Mrs. Knoll then drove him further down the road and let him out.

Dr. Danforth visited his wife at the Ollison home at 9:00 that evening to discuss her move to his ranch, and left thirty minutes later. He was not seen alive again.

At trial, the key state witnesses were Jack Pearcy and Harrison Williams,[3] whose versions of the events of August 12–16 were substantially the same. Much of their testimony consisted of the description of conversations and activities with Mr. Stith and with the defendant. Defense counsel apparently objected to the admission of this testimony as hearsay in a pretrial motion (although none appears in the transcript or record), but the court admitted the evidence on the condition that the state would later show independent evidence of the defendant's involvement in the conspiracy.

The testimony of the two fellow conspirators did differ on the question of intent to commit murder. Numerous comments by Mr. Williams indicated that he had intended to kill Dr. Danforth. As to the plan to stop the Danforth car on the way home from the Breckenridge Inn, he admitted that "we'd come up with the idea" of having the car

---

**2.** Mrs. Danforth continued to live at her mother's home after the wedding, as did Mike Stith. She testified that this was her husband's idea, necessitated by threats against him by a former girlfriend. She was to remain at her mother's home until Dr. Danforth considered it safe for her to move to his 2600-acre ranch. According

to defendant, he had just informed her that the time was right on the evening of August 17, the last time he was seen alive.

**3.** Mike Stith was convicted of the murder of Dr. Danforth and did not testify at defendant's trial.

pull over so that Mr. Pearcy could kill the doctor. In response to the question by defense counsel, "You never really intended on killing the doctor that day [at the hotel] did you?", he responded ambiguously, "I wasn't, no." But when asked, "You and Pearcy figured this whole thing out to be a scam on Mike [Stith], didn't you?", he said simply, "No." Later, although he testified that as time went by, he thought Jack Pearcy was losing his ability to do the job, he said that he was "always serious about it." He testified freely and casually as to his intent with such comments as, "After we'd killed him I'm sure we would have checked his pockets."

Mr. Pearcy, by contrast, when asked "Were you going to kill him?", replied, "No". He testified that he and Mr. Williams had talked about killing the doctor and "decided it'd be foolish." In response to the question, "Weren't you really talking about ripping off Mike [Stith] for his money?", he answered, "Yeah".

Over defendant's objection as hearsay, Mr. Frank Danforth, the deceased's son, testified to certain conversations with his father. He stated that his father was upset with Mrs. Danforth after their honeymoon because "she gave him the run around up at the Breckenridge Inn." Further, he testified that his father had said, "If this doesn't work ... if she will not come and live with me, I'm going to sue her for everything I've given her."

The defendant denied all knowledge of the conspiracy testified to by Mr. Pearcy and Mr. Williams. She said that although she and Mr. Stith had once been romantically involved, that relationship ended in early 1980. She admitted, however, writing a letter to Mr. Stith while both were imprisoned and awaiting trial, expressing her desire to marry him and bear his children. She acknowledged honeymooning with Dr. Danforth at the Breckenridge Inn on August 13 and driving to McDonald's that evening, but stated that Mr. Pearcy and Mr. Williams were not telling the truth and that she did not know "why they would want to do this to me."

The jury found the defendant guilty of conspiracy to commit murder and sentenced her to ten years imprisonment.

On appeal, the defendant raises the following points: (1) § 564.016, the conspiracy statute, is unconstitutionally vague; (2) no class B felony of "conspiracy to commit capital murder" exists in Missouri and therefore, defendant was not properly charged with an offense; (3) the trial court erroneously admitted hearsay evidence as to conversations between Mike Stith, Jack Pearcy and Harrison Williams, and between Frank Danforth and Dr. Duncan Danforth; and (4) jury Instruction No. 5 was erroneous.

1. *Failure to preserve the constitutional issue*

■ Defendant's first point that § 564.016, under which she was charged in the information, is unconstitutionally vague would normally bring this appeal within the exclusive jurisdiction of the Missouri Supreme Court, and therefore, transfer of this matter would be warranted, Mo. Const. art. V, § 3; *see State v. Anderson,* 620 S.W.2d 378 (Mo.1981), even if her challenge of the statute appeared to be without merit. *State v. Davis,* 462 S.W.2d 178, 181 (Mo. App.1970). Transfer is not required, however, unless the defendant has properly preserved the issue for review by raising it at the earliest possible moment consistent with good pleading and orderly procedure and has further preserved it in her motion for new trial. *State v. Wickizer,* 583 S.W.2d 519, 523 (Mo.1979) (en banc); *State v. Hegwood,* 558 S.W.2d 378, 381 (Mo.App.1977); *State v. Davis, supra.*

■ A defendant who wishes to challenge the constitutionality of the statute under which an indictment or information is drawn, must raise the issue "at the first opportunity in the course of an orderly procedure." *State v. Mackey,* 259 S.W. 430 (Mo.1924). In that case, the defendant first mentioned his challenge of the constitutionality of the law under which he was charged in his motion in arrest of judgment. The court held that to be too late,

stating at 430: "The information challenged his attention from the start, indicating the statute under which the charge was preferred, and its constitutionality could have been raised, and should have been raised, by his motion to quash, or other attack upon the information, before the trial." On the same day, a parallel development commenced when the court decided *State v. Cox,* 259 S.W. 1041 (Mo.1924). There the defendant raised a constitutional attack upon illegally seized evidence. He filed no pretrial motion to suppress, but objected to the use of the evidence after the jury had been sworn and while the trial was in progress. On appeal the court ruled that defendant's objection came too late to preserve the constitutional question, which "must be raised at the earliest possible stage of the proceedings or . . . be regarded as waived." *See also State v. Tunnell,* 302 Mo. 433, 259 S.W. 128 (Mo.1924); *State v. White,* 299 Mo. 599, 253 S.W. 724, 726 (Mo. 1923); *State v. Hale,* 248 S.W. 958, 959 (Mo.1923); *State v. Swift & Co.,* 270 Mo. 694, 195 S.W. 996 (Mo.1917). *Cf. State v. Flynn,* 519 S.W.2d 10, 12 (Mo.1975), and *State v. Wilwording,* 394 S.W.2d 383, 389 (Mo.1965).

The parallel rules of *Cox* and *Mackey* have long been codified in the Rules of Criminal Procedure, Rule 24.04(b)(2) and Rule 24.05 [4] and their predecessors. Rule 24.04 prescribes the proper time to raise such fundamental questions as the constitutionality of laws upon which prosecutions are based. *State v. Flynn, supra.* The rule as last amended, effective January 1, 1980, (before the commission of the instant crime) provides in relevant part as follows:

Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion *before trial.* The motion *shall* include all such defenses and objections *then available* to the defendant. Failure to present any such defense

or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. (Emphasis added.)

If enforced, the rules offer to defendants considerable assurance that meritorious claims of constitutional infirmity of criminal statutes and illegally acquired evidence will be heard. If heard, the expense, agony and uncertainty of trials which should never be held may be avoided. The administration of justice, the courts, the parties, and the public all benefit from enforcement of this rule, but defendants are the prime beneficiaries of the rule, and failure to take timely advantage of it constitutes a waiver of its benefits.

■ Here, defendant first raised the constitutional issue in a motion for judgment of acquittal at the close of the state's case and at the end of all the evidence and again in a post-trial motion. She sought no specific relief from her waiver and made no attempt to show cause as to why Rule 24.04 should not bar her late raising of the constitutional issue. Accordingly, we hold that motions at the close of the state's case and at the close of all the evidence were not timely and do not properly preserve the question for review. For that reason, we may neither consider the issue nor transfer this case to the Supreme Court for lack of jurisdiction, absent a showing of plain error. *State v. Wickizer, supra.* No such showing has been attempted.

### 2. *The class B felony of conspiracy to commit capital murder*

■ In her second point on appeal, defendant points out that she was charged by information with "the class B felony of conspiracy" to commit capital murder, an offense which she says does not exist under Missouri law.

Defendant's reasoning is as follows. Section 556.026 provides that "[n]o conduct constitutes an offense unless made so by

---

4. Rule 24.05. Misdemeanors or Felonies—Motions to Suppress
    Requests that evidence be suppressed shall be raised by motion before trial; however, the court may in its discretion entertain a motion to suppress evidence at any time during trial.

this code or other applicable statute." Section 564.016 declares that conspiracy to commit an offense is a class B felony *if* the object of the conspiracy is a class A felony, and therefore, defendant can only be charged with a class B felony in this case if capital murder is a class A felony. Section 565.001 which defines capital murder does not label the crime a "class A felony" and as a result, according to defendant, she has been improperly charged.

We are unpersuaded by defendant's argument. We need only look to § 557.021.-3(1)(a) to see that capital murder is a class A felony. That section provides:

[F]or determining the penalty for attempts and conspiracies, offenses defined outside of this code shall be classified as follows:

(1) If the offense is a felony

(a) It is a class A felony if the authorized penalty includes death, life imprisonment or imprisonment for a term of twenty years or more.

Section 565.008 specifically provides that capital murder is punishable by death or a minimum imprisonment of fifty years, and hence, by the definition of § 557.021.3(1)(a), it is a class A felony.

Defendant's contention that § 557.021.-3(1)(a) cannot be used in this context because it applies only to offenses "defined outside of this code" overlooks the fact that capital murder is, in fact, defined *outside* the code. Section 565.001, defining capital murder, was effective May 26, 1977, and pre-dated the current criminal code which was enacted by the legislature in June, 1977 in Senate Bill No. 60 and which became effective January 1, 1979. As stated in *State v. Durley,* 603 S.W.2d 72, 73 (Mo.App. 1980):

Senate Bill No. 60 was a comprehensive effort to codify most, but not all, of the Missouri Criminal Statutes. The code provided, in § 556.031, that "1. The provisions of this code shall govern the construction and punishment for any offense defined in this code and committed after January 1, 1979 . . . 2. Offenses defined outside of this code and not repealed shall remain in effect . . . ." This language clearly states that *"code offenses" refer only to the offenses listed in Senate Bill No. 60, and that offenses in existence and not repealed by the enactment of the code are offenses outside the code.* (Emphasis added.)

The offense of capital murder was neither listed in Senate Bill 60 nor repealed by it. It is, therefore, an offense outside the code.[5] That being so, § 557.021.3(1)(a) is directly applicable.

Capital murder is, therefore, a class A felony. Conspiracy to commit capital murder is, then, a class B felony under § 564.-016. Defendant was properly charged with an offense under Missouri law.

### 3. *Hearsay evidence*

Defendant objects in her third point to certain evidence admitted over her objection as hearsay. She raises three subpoints here, specifically (1) that testimony by Jack Pearcy and Harrison Williams regarding the initial conversations with Mike Stith before and on August 12 where "roughing up" Dr. Danforth was discussed was inadmissible hearsay; (2) that before such testimony could be admitted, the state was required to introduce independent evidence of the conspiracy; and (3) that testimony by Frank Danforth as to statements by his father, Dr. Danforth, was inadmissible hearsay.

Defendant's primary objection to the admission of the conversations between Mr. Pearcy, Mr. Williams and Mr. Stith on and before August 12 is that she was not involved in the conversations and had nothing to do with the agreement to "rough up" Dr. Danforth. She characterizes this agreement as a separate conspiracy to assault in

---

**5.** *See also* MAI–CR2d 17.00.4, Application of MAI–CR forms to code, pre-code and non-code offenses, which defines "code offenses" as "those offenses defined in the criminal code (Senate Bill 60) adopted in 1977, effective January 1, 1979." "Non-code offenses" are defined as "those offenses committed after the code takes effect on January 1, 1979, but which are defined by statutes outside the code. Examples are given above: the homicide laws, the weapons laws, etc."

which she had no motive to be involved, one which occurred prior to the formation of the later conspiracy to kill.

■■■ Of course, the general rule is that hearsay evidence is inadmissible. An exception is made, however, for statements by a co-conspirator made in furtherance of the conspiracy. *State v. Garton,* 371 S.W.2d 283, 287–88 (Mo.1963); *State v. McCollum,* 598 S.W.2d 198, 200 (Mo.App.1980). Nevertheless, if the declaration is made before the formation of the conspiracy with which defendant is charged, it is inadmissible hearsay and not binding on the co-conspirator. *State v. Chernick,* 280 S.W.2d 56, 60 (Mo.1955); *State v. Rayner,* 549 S.W.2d 128, 131 (Mo.App.1977).

■■■ If defendant were correct, then, that the testimony related to a prior conspiracy to which she was not a part, her point would have merit. The evidence, however, simply does not support that version of the facts and, instead, strongly suggests that a two-way conspiracy to kill Dr. Danforth existed between Mike Stith and the defendant prior to the August 12 conversation in which the conspiracy became four-way. At the August 12 meeting, Mr. Stith informed Mr. Pearcy and Mr. Williams that murder was involved and proposed a plan. Although the defendant did not take part, she was linked circumstantially to this conversation in a number of ways. First, she was waiting in the car during the meeting. That alone, of course, could not convict her of conspiracy. But in addition, Mr. Stith's comments on August 12 showed that he had the cooperation of the defendant in determining when she and the doctor would be present at the Breckenridge Inn. Although he wanted the murder done that night, when told that that was too soon, he simply agreed that "they would make plans" to have the couple at the inn the next night. Without some cooperation by defendant, such a change in plans would have been impossible. Because the purpose of the Breckenridge Inn trip was always said to be a "honeymoon", Mr. Stith's ease in changing plans also suggests considerable cooperation by the defendant in the setting of the wedding date. (Her comment at the inn that the doctor had to be killed because Mike Stith needed money shows that her motivation was tied to her inheritance, making the timing of her marriage critical to the plan.) This degree of cooperation strongly suggests that sometime before August 12, the defendant had already agreed with Mike Stith that Dr. Danforth should be killed and that in furtherance of that agreement, she would cooperate in the timing of her wedding and honeymoon. Further, a critical part of the plan proposed on August 12 was defendant's cooperation in sending her husband out to the parking lot. Mr. Stith apparently was highly confident at that time that the defendant would cooperate in this manner; he told Mr. Pearcy and Mr. Williams where the Danforths would be and the precise time Mrs. Danforth would send the doctor out to the parking lot. That conversation on August 12, then, was not a separate conspiracy, but simply an attempt to hire two "hit men" who would carry out the plan of the two original conspirators. All of these implications are buttressed by the defendant's actual involvement in the activities at the inn on August 13, where she acted exactly as Mike Stith had said she would, providing strong circumstantial evidence that on August 12 she was already a partner (albeit a silent one) in the agreement to kill. A conspiracy can be shown to exist by circumstantial evidence. *State v. Baldwin,* 358 S.W.2d 18, 24 (Mo.1962); *State v. McCollum, supra,* at 200.

■■■ We find, therefore, that the conversations of August 12 and before were admissible as evidence of an agreement to kill Dr. Danforth to which the defendant was a party and were not merely conversations prior to the formation of the conspiracy.

Defendant argues, nevertheless, that even if these conversations were admissible, the state could not introduce them without first having introduced independent evidence of the claimed conspiracy. She contends that not only did the state not do so, it *could not* do so because neither Mr. Pearcy nor Mr. Williams agreed to kill the doctor.

Defendant bases this argument on Mr. Pearcy's negative response to the question,

"Were you going to kill him?" and his affirmative response to "Weren't you really talking about ripping off Mike [Stith] for his money?" From this, defendant concludes that neither Mr. Pearcy nor Mr. Williams intended murder and, therefore, she could not be guilty of agreeing with anyone as required by § 564.016 which provides in part:

1. A person is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitating its commission he *agrees* with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense. (Emphasis added.)

The record speaks differently. First, Mr. Williams never testified that he did not intend murder and, in fact, he said that he did not intend a "scam on Mike" and that he was "always serious about it." Second, both Mr. Pearcy's and Mr. Williams' actions speak louder than words and give convincing evidence that they had agreed to kill Dr. Danforth. Had their intention been to "rip off" Mr. Stith, they could have taken his money and run instead of going to the Breckenridge Inn and Climax Springs according to Mr. Stith's directions. All of the testimony as to their activities at the inn and their positioning themselves beside Knob Hollow Road indicates an intent to kill and a desire to earn the additional $2500 Mr. Stith had agreed to pay for murder.

■ Accordingly, we find that the state has adequately established independent evidence of an agreement to kill Dr. Danforth, to which the defendant was linked by direct evidence of her activities at the Breckenridge Inn. Defendant's contention that such evidence must precede the admission of the co-conspirator's testimony is without merit. While the general rule is that proof of a conspiracy should come before declarations of a fellow conspirator, "the rule is not inflexible. The order of proof rests largely in the discretion of the trial court." *State v. Stogsdill,* 324 Mo. 105,

23 S.W.2d 22, 31 (1929). In that regard the court in *State v. Brooks,* 159 S.W.2d 646, 647 (Mo.1942), said of an exhibit not properly identified at the time it was introduced:

Ordinarily, "the order of proof is a matter largely in the discretion of the trial court, and if evidence, seemingly incompetent when offered, is later shown by developments in the case to be competent and material, we are not inclined to hold its premature introduction prejudicial error unless there is some showing that a party litigant was prejudiced by such untimely admission." *State v. Reagan,* Mo.Sup., 108 S.W.2d 391, loc. cit. 397.

We find no prejudice here where later direct evidence by Mr. Pearcy and Mr. Williams described in detail defendant's part in the agreement to kill Dr. Danforth.

■ In her third subpoint on hearsay, defendant challenges the admission of testimony by Frank Danforth that after the honeymoon his father was upset with his new wife because "she gave him the run around up at the Breckenridge Inn" and that his father had said, "If this doesn't work . . . if she will not come and live with me, I'm going to sue her for everything I've given her." The statements were offered by the state, not to prove the truth of the matter asserted, but explicitly to show the declarant's state of mind at the Breckenridge Inn and immediately after his return, a matter which was relevant here because it corroborated and supported the testimony of other witnesses that defendant wanted her husband killed on August 13 because she thought that if she did not sleep with him that night, he would cut her out of his will. "[D]eclarations revealing a state of mind . . . are not admissible to prove the truth of such recitals. But . . . such declarations may be properly admitted in evidence solely to establish that state of mind." *State v. Singh,* 586 S.W.2d 410, 418 (Mo.App.1979). Accordingly, we find no error in the admission of this testimony.

### 4. *Instruction No. 5*

Finally, defendant argues that Instruction No. 5 [6] was prejudicially erroneous for

---

**6.** INSTRUCTION NO. 5

If you find and believe from the evidence beyond a reasonable doubt:

First, that at some time or times between August 11, 1980 and August 17, 1980 in Jackson County and Camden County, State of

five reasons: (1) it constituted a fatal variance from the information in that it permitted conviction for agreements entered into in either Camden or Jackson County, although the information mentioned only Camden County; (2) it did not comply with MAI–CR 2d 18.04 because it submitted the elements in the disjunctive rather than the conjunctive and failed to require belief beyond a reasonable doubt; (3) it permitted the jury to find the "overt act" required for conviction of conspiracy in actions taken before the agreement was made and actions not pleaded in the information; (4) it permitted conviction for conspiracy to commit murder rather than capital murder, as charged in the information, and instructed on a punishment unauthorized in the law; and (5) the elements of the offense listed in the instruction were not supported by substantial evidence.

Defendant's first claim of error here is that the instruction permitted conviction for agreements entered into in Jackson County and Camden County, even though the information charged her only with an agreement in Camden County. She claims that this variance prejudiced her in that the information failed to fix venue and inform her of the charge against her.

Defendant's claim has no merit. She asked for and received a bill of particulars setting forth the facts surrounding the charge in the information that she "caused Duncan R. Danforth to be physically present at locations" where her co-conspirators had agreed to kill him. The bill named, among other places, the Breckenridge Inn at I–435 and Front Street in Kansas City, Missouri, a location in Jackson County. Although a bill of particulars will not necessarily validate an invalid information, *State v. Hasler,* 449 S.W.2d 881, 885 (Mo.App.1969), an information need not set forth all the details of the crime. Further, a variance between an information and an instruction, to be fatal, must be material

Missouri, the defendant agreed with Jack Pearcy, Harrison D. Williams and Mike Stith that one or more of them would commit the offense of the murder of Duncan R. Danforth, and

Second, that the defendant so agreed with the purpose of facilitating commission of that offense, and

Third, that in pursuance of that agreement Loretta Ollison Danforth, Jack Pearcy, Harrison D. Williams or Mike Stith committed one or more of the following acts:

A. The defendant Loretta Ollison Danforth caused Duncan R. Danforth to go into the parking lot of the Breckenridge Inn; on one or more occasions on the evening of Wednesday, August 13, 1980; or

B. The defendant Loretta Ollison Danforth and Duncan R. Danforth drove together to the McDonald's Restaurant in the vicinity of the Breckenridge Inn in the evening hours of Wednesday, August 13, 1980; or

C. The defendant Loretta Ollison Danforth left open the door to the room in the Breckenridge Inn which she and Duncan R. Danforth were occupying so that Jack Pearcy or Harrison D. Williams or both of them could enter the said room; or

D. The defendant Loretta Ollison Danforth caused Duncan R. Danforth to be present at the Ray Ollison residence on or about August 15, 1980 in the late evening hours; or

E. Jack Pearcy and Harrison D. Williams came to Camden County, Missouri in furtherance of the conspiracy to murder the said Duncan R. Danforth; or

F. Jack Pearcy or Harrison D. Williams went to a point on Kolb Hollow Road in Camden County, Missouri and waited for Duncan R. Danforth to pass in furtherance of the conspiracy to murder the said Duncan R. Danforth; or

G. The defendant Loretta Ollison Danforth caused Duncan R. Danforth to be present in the driveway in front of the Ray Ollison residence in the late evening hours of August 17, 1980 for the purpose of the conspiracy to murder the said Duncan R. Danforth,

then you will find the defendant guilty of conspiracy to commit murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the propositions contained in paragraphs "First" and "Second" above, and further if you do not find and believe from the evidence at least one of the propositions contained in sub-paragraphs "Third", "A" through "G", you must find the defendant not guilty of conspiracy to commit that offense.

If you find the defendant guilty of conspiracy to commit murder, you will assess and declare her punishment at imprisonment for a term of years fixed by you but not less than five (5) years and not to exceed fifteen (15) years.

and prejudicial to the rights of the defendant. *State v. Johnson,* 606 S.W.2d 655, 657 (Mo.1980); *State v. Macone,* 593 S.W.2d 619, 621 (Mo.App.1980). Here, where the state's response to the bill of particulars adequately informed defendant of the facts involved, no surprise or prejudice resulted.[7] She had adequate notice and opportunity to prepare her defense.

Defendant's second claim of error as to Instruction No. 5 is that it failed to comply with MAI–CR 2d 18.04(1) because in paragraph three enumerating overt acts taken by the defendant or her co-conspirators, it submitted the acts in the disjunctive (using "or" between the acts) rather than the conjunctive (using "and") and failed to require belief beyond a reasonable doubt.

As to the first part of this contention, we can only surmise that defendant has misread MAI–CR 2d 18.04(1) which makes no requirement that the overt acts be submitted in the conjunctive. It simply requires a "concise statement . . . of one or more overt acts committed in furtherance of the conspiracy, using more than one paragraph if necessary." Because conviction for conspiracy requires only one overt act in furtherance of the conspiracy, § 564.-016.4, requiring the jury to find that all the alleged overt acts occurred would have been contrary to law.

As to the second part of this contention, defendant calls our attention to the paragraph in Instruction No. 5 directing acquittal if the jury does not find the necessary elements of the crime:

> However, *if you do not find and believe from the evidence beyond a reasonable doubt* each and all of the propositions contained in paragraphs "First" and "Second" above, and further, *if you do not find and believe from the evidence* at least one of the propositions contained in sub-paragraphs "Third", "A" through "G", you must find the defendant not

guilty of conspiracy to commit that offense. (Emphasis added.)

The "acquittal" paragraph which appears in MAI–CR 2d 18.04(1) provides as follows:

> However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of conspiracy to commit that offense.

Here, where several overt acts were submitted to the jury, any one of which could justify conviction under § 564.-016.4, the trial court's omission of "each and all" was a correct modification. However, although the court began the paragraph with the admonition that the propositions in paragraphs one and two must be found "beyond a reasonable doubt", that phrase was omitted in regard to paragraph three's listing of overt acts. This was not a correct statement of the standard. We are required, however, to consider the instructions as a whole when error has occurred, to determine whether prejudice has resulted. *State v. Holt,* 592 S.W.2d 759, 776 (Mo.1980) (en banc). Here, we find none. The instruction begins with "If you find and believe from the evidence beyond a reasonable doubt", followed by a listing of all the necessary elements including the overt acts listed in paragraph three (see footnote 6), and, as we have seen, the phrase was again repeated in the acquittal paragraph. In this instance, the jury would appear to have been well-informed as to the standard by which it was to judge the defendant, and accordingly, we do not find that the trial court's inadvertent failure to repeat the phrase necessarily prejudiced defendant.

Defendant's third claim of error as to Instruction No. 5 contains several sub-points. She first complains that the instruction permitted the jury to find that an agreement was reached as late as August 17, and yet a number of the overt acts listed

---

7. This case is distinguishable from *State v. Ballard,* 394 S.W.2d 336 (Mo.1965), cited by defendant, in which the court held that the information which charged defendant with larceny in St. Louis "city" fatally varied from the instruction charging larceny in St. Louis "coun-

ty." In *Ballard,* no bill of particulars informed the defendant of the particular facts involved, and he was genuinely surprised by the variance. The bill of particulars in the case before us removed the element of surprise.

in the instruction occurred before that date. Defendant cites the rule that an overt act must occur during, not before, the agreement and argues that contrary to law, this instruction permitted the jury to find the necessary overt act in actions which occurred before the agreement. In so arguing, defendant has overlooked the fact that paragraph three required the jury to determine whether any of the overt acts listed occurred "in pursuance of that agreement." If they did, indeed, find that the agreement did not occur until August 17, none of the acts before that date could have furthered the agreement. We must assume that, consistent with the instruction, whatever date the jury found the agreement to have occurred, the overt acts which it found to be in pursuance and furtherance of that agreement followed the date of the agreement.

■ Defendant complains as well that the instruction permitted the jury to find overt acts (in subparagraphs "E" and "F") which were not pleaded in the information. Because both of these acts were listed in the bill of particulars, we find that defendant had proper notice and suffered no prejudice. Similarly, in light of our ruling, *supra,* that the acts of Mr. Pearcy and Mr. Williams were performed in furtherance of the conspiracy to kill Dr. Danforth (and not merely to "rip off" Mike Stith), defendant's complaint that the instruction permitted the jury to find overt acts which the "binding evidence of the State showed were not committed in furtherance of the unlawful purpose" is without merit.

Defendant's fourth claim of error as to Instruction No. 5 is that it fatally varied from the information by charging the defendant with "conspiracy to commit murder" while the information charged her with "conspiracy to commit capital murder." Moreover, she argues that the range of punishment set out in the instruction is without authority in the law.

■ Again, defendant's argument must fail, for no prejudice resulted from this variance. The charge in the instruction was not broader than that in the information, adding new and distinct charges as was the case in *State v. Littler,* 186 S.W. 1045 (Mo.1916), on which defendant relies. The elements of "conspiracy" remain the same no matter what crime·is the object of the conspiracy. Only the punishment varies according to the criminal object. § 564.016.

As discussed extensively in defendant's second point, *supra,* "conspiracy to commit capital murder" is a class B felony because "capital murder" is a class A felony. *See* § 557.021.3(1)(a), § 565.008.1, § 564.016.-8(1). In addition, because all other degrees of murder are class A felonies,[8] conspiracy to commit any degree of murder is a class B felony. The failure to specify "capital" murder in the instruction, then, did not prejudice defendant and the punishment authorized by § 558.011.1(2), imprisonment for a term "not less than five years and not to exceed fifteen years", was applicable. Because this was the range of punishment which appeared in the instruction, defendant's contention that it was not authorized by law is in error.

■ Defendant's final claim of error as to Instruction No. 5 is that the elements of the offense which it contains were not supported by substantial evidence. She erroneously contends that she can be convicted of conspiracy to commit murder only if she engaged in a four-way meeting with Mr. Pearcy, Mr. Williams and Mr. Stith, at which they agreed to murder Dr. Danforth. The law of conspiracy makes no such requirement. One can be guilty of conspiracy by conspiring with one person who, in turn, conspires with others, even when the identity of those others remains unknown to the original conspirator. § 564.016.2. Here, the jury heard testimony as to an agree-

---

**8.** A class A felony is one in which "the *authorized* penalty *includes* death, life imprisonment or imprisonment for a term of twenty years or more." (Emphasis added.) § 557.021.3(1)(a). Murder in the first degree is punishable by life imprisonment. Murder in the second degree is punishable by imprisonment "for a term of not less than ten years." § 565.008(2). The phrase "not less than ten years" sets a minimum and *authorizes* any term of ten years or more. Therefore, it necessarily includes a term of twenty years or more (without requiring a term of that length) and comes within the language of § 557.021.3(1)(a).

ment to murder the doctor to which the defendant was circumstantially linked as well as direct evidence of her overt acts committed in furtherance of that conspiracy. Substantial evidence was not lacking.

For the foregoing reasons, we affirm the conviction of the defendant.

All concur.

## ON MOTION FOR REHEARING

PER CURIAM.

Although we hereby overrule and deny defendant's motion for rehearing or for transfer to the Supreme Court filed under Rules 83.02 and 84.17, a point raised by the motion requires comment.

In this case, defendant challenges the constitutionality of the conspiracy statute, § 564.016, under which she was prosecuted, a challenge we held to be untimely when made for the first time at the close of all the evidence.

On motion for rehearing, defense counsel has directed us to a line of cases stemming from *Ex parte Smith,* 135 Mo. 223, 36 S.W. 628, 630 (1896), a habeas corpus proceeding in which the court stated that because an unconstitutional law "is no law, then its constitutionality is open to attack at any stage of the proceedings, and even after conviction and judgment, and this upon the ground that no crime is shown, and therefore the trial court had no jurisdiction . . . ." Accordingly, the court held that the constitutionality of the vagrancy statute under which defendant was convicted would be considered in a habeas corpus proceeding.

In *In re Flukes,* 157 Mo. 125, 57 S.W. 545 (1900), *Ex parte Lerner,* 281 Mo. 18, 218 S.W. 331 (1920), and *Ex parte Taft,* 284 Mo. 531, 225 S.W. 457 (1920) (en banc), the rule was again applied to permit review of the constitutionality of a statute in a habeas corpus proceeding.

The Supreme Court cited this rule as well in *Kansas City v. Hammer,* 347 S.W.2d 865 (Mo.1961) (permitting the circuit court to determine the constitutionality of an obscenity ordinance first raised by defendant in the municipal court but waived in the circuit court); *Kansas City v. Douglas,* 473 S.W.2d 101 (Mo.1971) ("[a]ssuming without deciding that these cases [*Hammer, Lerner* and *Smith*] provide an exception to the general rule that constitutional questions must be raised at the first available opportunity . . ."); and *State v. Mitchell,* 563 S.W.2d 18 (Mo.1978) (en banc) (permitting defendant to challenge on appeal the constitutionality of the statute classifying marijuana as a schedule I substance, even though he pleaded guilty to the charge, because "jurisdictional defects and defenses are not waived by entering a guilty plea.")

In its latest decision in this line of cases, the Supreme Court quoted *Ex parte Smith, supra,* in *State ex rel. Williams v. Marsh,* 626 S.W.2d 223 (Mo.1982) (en banc), and held that because the facial unconstitutionality of a statute relied on by a plaintiff as a basis for relief is a matter of subject matter jurisdiction, the trial court was empowered to decide the point at any time *sua sponte.*

By contrast, in our opinion we have relied on a separate line of cases holding that constitutional questions—even those challenging the facial constitutionality of a statute under which the defendant is charged—must be raised at the earliest possible moment and preserved in a motion for new trial.

That rule originated with *State v. Mackey,* 259 S.W. 430 (Mo.1924), as discussed in our opinion. *Mackey* was cited in *State v. Lofton,* 1 S.W.2d 830, 832 (Mo.1927), in which the court held that the defendant's failure to challenge at trial the constitutionality of the statute under which he was charged "is a concession of the validity of the statute."

Without distinguishing or citing the *Ex parte Smith* line of cases in any way, the *Mackey* rule was followed as well in *State v. Byrne,* 503 S.W.2d 693 (Mo.1973) (en banc) (holding that defendant's challenge that the statute under which he was charged was unconstitutionally vague was not properly preserved because it was not raised at any stage of the trial proceedings),

and *State v. Flynn,* 519 S.W.2d 10 (Mo. 1975), involving a statutory challenge on the grounds of unconstitutional vagueness. In *Flynn,* the Supreme Court stated at 12 that a constitutional question must be raised at "the earliest time consistent with good pleading and orderly procedure," and that where that issue pertains to the information or indictment, "[t]he earliest possible moment . . . is in a motion to dismiss or to quash . . . ."

The *Mackey* rule as reaffirmed in *Flynn* was followed by the Supreme Court most recently in *State v. Wickizer,* 583 S.W.2d 519 (Mo.1979) (en banc), in which the court did not permit defendant to raise a constitutional challenge to the sodomy statute under which he was convicted for the first time on appeal. Judge Morgan wrote the majority opinion in which Judges Rendlen, Donnelly and Simeone concurred. Judge Simeone concurred as well with Judge Bardgett in his concurring opinion in which he cited *Kansas City v. Hammer, supra,* for the rule that the question is one of subject matter jurisdiction and cannot be waived. Judge Seiler dissented on another ground but concurred in Judge Bardgett's concurring opinion on the subject matter jurisdiction issue.

None of the cases in either of these lines of decisions has been overruled.

We adhere to the position adopted in our opinion herein, noting that whenever the Supreme Court has specifically addressed the timeliness question it has adhered to the rule it set out in *State v. Mackey, supra.*